BORGNIS and others, Respondents, vs. THE FALK COMPANY, Appellant.

*November 1—November 14, 1911.*

CONSTITUTIONAL LAW: WORKMEN'S COMPENSATION ACT. *(1–5) Validity of statutes: When passed upon by courts: Construction of general language in constitution: Changed conditions: Public policy. (7–11) Equality: Classification. (6, 9–12) Master and servant: Accidental injuries: Abolishing defenses: Assumption of risk and negligence of fellow-servants: Classification of employers: Acceptance of compensation act: Number of employees: Act not coercive: Conjectural results. (13) Statutes: Effect of partial invalidity: Legislative declaration. (14–20) Judicial power: Administrative boards: Industrial Commission: Jurisdiction: Review by courts: Certiorari: Stipulating away right to resort to courts: Arbitration. (21) Injuries to public employees: Compensation: Taxation: Public purpose. (22, 23, 25) Proceedings before Commission: Notices, etc.: Due process of law. (24) Infants: Right to contract for service. (26–28) To whom compensation act applies: Contracts of service not affected: Vested rights: Change in remedy for future torts: Equity: Injunction against acceptance of law.*

1. Special circumstances may make it the duty of the court to pass upon the constitutionality of a statute even where a decision of that question is not essential to a disposition of the particular case before it.

2. A statute must be sustained unless it is clear beyond reasonable question that it violates some constitutional limitation or prohibition.

3. Constitutional commands and prohibitions either distinctly laid down in express words or necessarily implied from general words must be implicitly obeyed; but where a statute framed to meet new economic conditions and difficulties arising therefrom is attacked as contravening the general language or policy of the constitution, not merely the conditions prevailing at the time of the adoption of the constitution but also the changed social, economic, and governmental conditions and ideals of the present time and the problems which those changes have produced must be considered in determining the questions of construction and interpretation of such general language or policy. But see separate opinions of BARNES and MARSHALL, JJ.

4. When acting within constitutional limitations, the legislature settles and declares the public policy of the state; and a constitutional statute cannot be held to be contrary to public policy.

5. Courts may determine public policy upon a subject only by declaring the principle of common law applicable thereto, in the absence of constitutional or statutory determination as to such policy; and any public policy thus created or determined by the courts may be at any time reversed or changed by the legislature, provided it acts within constitutional lines.

6. A statute abolishing, in actions by servants against masters for injuries accidentally received, the defenses of assumption of risk and negligence of fellow-servants is valid, in the absence of any express constitutional provision on the subject.

7. Although the legislature might in its discretion classify occupations and abolish said defenses as to the more hazardous industries while retaining them as to the less hazardous, it need not make such classification, but may abrogate the defenses as to all occupations.

8. Classification in statutes must be based on substantial distinctions which make real differences, must be germane to the purpose of the law, must not be limited to existing conditions only, and must apply equally to each member of the class.

9. In the Workmen's Compensation Act (ch. 50, Laws of 1911; secs. 2394—1 to 2394—32, Stats.), providing a comprehensive scheme by which accidental injuries to employees are to be compensated for by the employers according to certain definite rules to be administered by an Industrial Commission, a provision abrogating the defenses of assumption of risk and negligence of fellow-servants as to those employers who do not elect to come under the law, but preserving such defenses intact to those who do so elect, does not involve any invalid classification.

10. A minor classification in such act by which the fellow-servant defense is preserved as to all employers employing less than four employees in a common employment is also valid.

11. The question as to the legitimacy of such a classification is not whether there may be some in one class whose situation is practically the same as that of some in the other class, but whether there is a "distinction between the classes as classes, whether there are characteristics which, in a greater degree, persist through the one class than in the other which justify legal discrimination between them."

12. The Workmen's Compensation Act expressly gives to each employer and employee a free choice as to whether he will accept

its terms or not; and its provisions abolishing, as to those employers only who do accept, the defenses of assumption of risk and negligence of fellow-servants cannot be said to be in fact coercive of acceptance; nor can it be said that when the employer accepts the law the employee will feel compelled to accept also, through fear of discharge if he do not accept. Such results are conjectural only, and a statute cannot be held invalid upon mere speculation or conjecture.

13. The legislature may properly declare, in a statute, its intention that one part or section thereof is not a compensation for and that it may be separated from the remainder of the act, for the very purpose of saving such remainder from being invalidated in case the first-named part or section be held unconstitutional.

14. The Industrial Commission by which the Workmen's Compensation Act is to be administered is not a court. It is an administrative body which is empowered, in the course of its administration of the law, to determine some questions of fact and apply the existing law thereto, and in so doing it acts *quasi*-judicially, but it is not thereby invested with judicial power in contravention of the constitution. Art. VII, sec. 2.

15. Administrative boards or commissions may lawfully be endowed with very broad powers, and a decision of such a board, when acting within its jurisdiction, but not otherwise, may be made conclusive and not subject to review by the courts.

16. The question of the jurisdiction of such a board is one always open to review by the courts, and if no appeal from the board is provided such review may be had on writ of *certiorari*.

17. Clear violations of law in arriving at the result reached by the board, such as acting without evidence when evidence is required, or making a decision contrary to all the evidence, constitute jurisdictional error and will justify reversal of the board's action, as well as the failure to take the proper steps to acquire jurisdiction at the beginning of the proceeding.

18. Questions as to the existence of the facts upon which the right of the Industrial Commission to act depends—as whether both employer and employee have elected to come under the act, and whether the injury was received in service growing out of the employment as the result of accident and not of wilful misconduct—must be decided by the Commission in the first instance, but, being jurisdictional questions, the decision thereof must be open to review in some court of competent jurisdiction.

19. Although the act provides that the findings of fact made by the Commission shall, in the absence of fraud, be conclusive, yet it also provides for an action in the circuit court in which the Commission's award may be set aside upon the ground, among

others, that the Commission acted "without or in excess of its powers;" and the quoted expression is equivalent to or at least inclusive of the expression "without or in excess of its jurisdiction," as those words are used in *certiorari* actions.

20. When employer and employee elect to come under the law they do not thereby wholly stipulate away their rights to resort to the courts, but merely make an agreement, in effect, to arbitrate special matters, such as the extent of an injury or disability and the like, leaving open to review in the courts the issues as to fundamental rights, namely, whether the parties have elected to come under the law and whether the injuries were received as therein specified.

21. The legislature may properly provide how compensation shall be made for accidental injuries sustained by employees in the public service; and in raising money to discharge such obligations the state or the municipalities levy taxes for a proper public purpose and do not deprive taxpayers of their property without due process of law.

22. The Industrial Commission being merely an administrative board, not a court, the clauses of sec. 2394—16, Stats. (Laws of 1911, ch. 50), providing for the giving notice of claim by mail, and allowing testimony to be taken without notice to either party, are valid.

23. If notice, either actual or constructive, of the commencement of the proceedings before such a board be given to the parties interested, and they be given full and free opportunity to be heard and present evidence, it is sufficient, even though notice of intermediate steps of the proceeding be not required or given; and this is especially true of a board which, like the Industrial Commission, acts only on the rights of parties who have consented that it may so act.

24. The legislature may endow minors with the right to make contracts otherwise lawful; and the provision of the Workmen's Compensation Act which declares that a minor who is legally entitled to work shall have the same power of contracting for service as an adult, is not objectionable.

25. Objections to the act which, even if sustained, would not invalidate the entire law but only specific provisions thereof, are not now passed upon, but are reserved for consideration when actual cases shall arise calling for a decision thereof. Among the questions so reserved are those as to the validity of the provision that the Commission or any member thereof, *or any examiner appointed thereby*, shall have power to issue subpœnas, obedience to which shall be enforced by contempt proceedings in the circuit court, and as to the validity of the clauses which

empower the Commission (1) to declare and enforce penalties against the employer for failure to perform certain orders of the Commission made pending hearing (sec. 2394—17); (2) to set aside or modify contracts of settlement previously made by the parties (sec. 2394—15); and (3) to regulate the amount of contingent attorney's fees and permit one claimant to make a contract which it may refuse to allow another to make (sec. 2394—22).

26. The Compensation Act was plainly intended to apply to all employers and employees, including persons employed under contracts of service which were made prior to its passage and do not expire until some definite time thereafter; but the obligations of such contracts are in no wise impaired.

27. The legislature may at any time change the remedy for torts yet to be committed, and such changes do not affect or impair existing contracts of employment.

28. A court of equity will not at the suit of an employee restrain his employer from electing to come under the Compensation Act on the ground that such election will compel the employee to withdraw from his contract of employment or to come under the law himself. If the employer breaks his contract because the employee declines to accept the law, the employee has an adequate remedy at law for such breach; and if the employee accepts the law he loses no contract or vested right and is not damaged, in the eyes of the law, by the change in his remedy for future torts.

APPEAL from a judgment of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Reversed.*

It appears by the complaint that the defendant is a manufacturing corporation in Milwaukee, employing at its shops many workmen, among whom are the plaintiffs. The plaintiff *Borgnis* is the superintendent of one of the departments in the defendant's establishment at a salary of $2,000 per year, under a contract extending some time in the future. The plaintiff *Schumacher* is an infant seventeen years of age, employed under an apprenticeship contract which has yet nearly three years to run. The complaint further alleges that the defendant threatens to file an election to become subject to the provisions of ch. 50 of the Laws of 1911, known as the Workmen's Compensation Act; that such election will compel the

plaintiffs severally to withdraw from their said contracts or to submit to the provisions of said act, and that hence said election will thus work irreparable injury to the plaintiffs, for which they have no adequate remedy at law.   The prayer is that the defendant be enjoined from filing such election during the continuance of the contracts.   By answer the defendant admitted the allegations of the complaint, except the allegations of irreparable injury and absence of an adequate remedy at law, which were denied, and as an affirmative defense alleged that the act in question was null and void, because it violates a number of specified articles of the constitutions of the state and of the United States, and hence that the defendant's election to become subject to the act could not possibly work any injury to the plaintiffs.   Upon motion, judgment was entered upon the pleadings enjoining the defendant from electing to become subject to the act during the continuance of the plaintiffs' contracts, and the defendant appeals.

For the appellant there were briefs by *Carpenter & Poss,* and oral argument by *Paul D. Carpenter.*   They contended, *inter alia,* (1) that the unprecedented declaration of legislative intent in sec. 2394—32 is a confession of weakness and is also an attempt to evade the well established rule that "where parts of a law are unconstitutional and other parts valid, yet it evidently appears that the former were intended as compensations for the latter, and the connection between them is such as to warrant the belief that the legislature would not have passed the valid parts alone, there the whole act should be held invalid." *Slauson v. Racine,* 13 Wis. 398; *Lynch v. Steamer Economy,* 27 Wis. 69; *State ex rel. Walsh v. Dousman,* 28 Wis. 541; *Atkins v. Fraker,* 32 Wis. 510; *Slinger v. Henneman,* 38 Wis. 504; *State ex rel. Drake v. Doyle,* 40 Wis. 175; *Dells v. Kennedy,* 49 Wis. 555, 6 N. W. 246; *State ex rel. Cornish v. Tuttle,* 53 Wis. 45, 9 N. W. 791; *State ex rel. La Valle v. Sauk Co.* 62 Wis. 376, 22 N. W. 572; *Gilbert-Arnold L. Co. v. Superior,* 91 Wis. 353, 64 N.

W. 999.    This act is plainly a whole and every part of it is
a compensation for every other part.    While a declaration of
legislative intent contemporaneous with the act itself (or, as
in this case, part of the act) will be given great weight by the
courts, yet in the last analysis it is for the courts, not for the
legislature, to construe the laws and also to determine what
parts are inducements for the enactment of other parts.    *Ex
parte Blanchard,* 9 Nev. 101; *Dayton G. & S. M. Co. v. Sea-
well,* 11 Nev. 394; *Reiser v. William Tell S. F. Asso.* 39 Pa.
St. 137; *Smith v. Westerly,* 19 R. I. 437, 35 Atl. 526; *Mor-
gan Park v. Knopf,* 210 Ill. 453, 71 N. E. 340; *Ingalls v.
Cole,* 47 Me. 530; *Planters' Bank v. Black,* 11 Sm. & M.
(Miss.) 43; *Gough v. Pratt,* 9 Md. 526; *Householder v. Kan-
sas,* 83 Mo. 488; *Files v. Fuller,* 44 Ark. 273; *Tilford v.
Ramsey,* 43 Mo. 410; *New Orleans v. Louisiana Mut. Ins.
Co.* 26 La. 499; *Slutts v. Dana,* 138 Iowa, 244, 115 N. W.
1115; *Phila. & E. R. Co. v. Catawissa R. Co.* 53 Pa. St. 20;
*San Francisco v. Spring Valley W. Works,* 48 Cal. 493;
*County Seat of La Fayette Co.* 2 Pin. 523.    Should the court
rule that this section controls, then it is so obscure in itself
and so contradicted by the concluding clause of sec. 2394—4
that its meaning is, for practical purposes, impossible of as-
certainment.    But should the court ascertain the meaning of
said section and determine the same to be binding, then the
rule *expressio unius est exclusio alterius* applies, and after
setting aside the parts declared to be separable the entire bal-
ance of the act must positively stand or fall together.
(2) Subd. 2 of sec. 2394—1, abolishing the fellow-servant de-
fense for all employers who have at the time of the accident in
common employment four or more employees, is invalid.
The mere classification by numbers distinct from hazard can-
not stand.    The number of employees bears no relation what-
ever (or only a purely artificial one) to the hazard of the em-
ployment.    The abrogation of these defenses for certain
employments must rest on the ground that such employ-

ments are extrahazardous. *Employers' Liability Cases,* 207.
U. S. 463, 28 Sup. Ct. 141; *Mo. Pac. R. Co. v. Mackey,*
33 Kan. 298, 6 Pac. 291; *Mo. Pac. R. Co. v. Mackey,* 127
U. S. 205, 8 Sup. Ct. 1161; *Peirce v. Van Dusen,* 78 Fed.
693; *Chicago, M. & St. P. R. Co. v. Solan,* 169 U. S. 133,
18 Sup. Ct. 289; *Chicago, R. I. & P. R. Co. v. Zernecke,*
59 Neb. 689, 82 N. W. 26. A qualification of the fellow-
servant rule in the case of railroads in general has been held
to apply only to the employees engaged in the hazardous work
of the roads. *Mo., K. & T. R. Co. v. Medaris,* 60 Kan. 151,
55 Pac. 875; *Deppe v. C., R. I. & P. R. Co.* 36 Iowa, 52;
*Jemming v. G. N. R. Co.* 96 Minn. 302, 104 N. W. 1079;
*Bedford Q. Co. v. Bough,* 168 Ind. 671, 80 N. E. 529; *Indian-
apolis T. & T. Co. v. Kinney,* 171 Ind. 612, 85 N. E. 954.
The supreme court of the United States, however, has ex-
tended the ruling so as to include all employees of a railroad,
but this decision still rests upon the extrahazardous nature of
railroad work in general. *Louisville & N. R. Co. v. Melton,*
218 U. S. 36, 30 Sup. Ct. 676. See, also, *Chicago, M. & St.
P. R. Co. v. Westby,* 178 Fed. 619; *Gulf, C. & S. F. R. Co.
v. Ellis,* 165 U. S. 150, 17 Sup. Ct. 255; *Seabolt v. Comm'rs,*
187 Pa. St. 318, 41 Atl. 22; *Pasadena v. Stimson,* 91 Cal.
238, 27 Pac. 604. This clause in the Wisconsin act excludes
such an enormous class engaged in operations highly hazard-
ous and includes such an enormous class engaged in voca-
tions almost wholly free from risk, that the classification is
not based on hazard at all. (3) Sec. 2394—1, abrogating the
assumption of risk and (for certain employers) the fellow-
servant rule, is wholly void because public policy does not
require their abrogation in any but the hazardous trades. In
the cases in which the abrogation or change in these rules has
been upheld it will be noted that in the statutes so upheld the
defenses were abrogated or restricted only as to the hazardous
trades, such as railroading, mining, and the like. These de-
fenses can only be abrogated in the exercise of the police

power of the state and to subserve public policy, and it is for this court to determine whether public policy requires the abrogation of the defenses as attempted in this act.

*Arthur Breslauer,* for the respondent.

On behalf of the state there were briefs by the *Attorney General* and *Russell Jackson,* deputy attorney general, and oral argument by *Mr. Jackson.* They argued, among other things, that the defenses abolished are not constitutional rights, but are at most court-made, common-law defenses, or rules of public policy, which the legislature may qualify, abolish, or continue *ad libitum. Opinion of Justices* (Mass.) 96 N. E. 308; *Ives v. S. B. R. Co.* 200 N. Y. 271, 94 N. E. 431; *Quackenbush v. Wis. & Minn. R. Co.* 62 Wis. 411, 22 N. W. 519; *Quackenbush v. Wis. & Minn. R. Co.* 71 Wis. 472, 37 N. W. 834; *Employers' Liability Cases,* 207 U. S. 463, 28 Sup. Ct. 141; *Kiley v. C., M. & St. P. R. Co.* 138 Wis. 215, 119 N. W. 309; *Wilmington Star M. Co. v. Fulton,* 205 U. S. 60, 27 Sup. Ct. 412. In respect to the power of the legislature to abrogate the defense of assumption of risk, see, also, *Minnesota I. Co. v. Kline,* 199 U. S. 593, 26 Sup. Ct. 159; *Hall v. West & S. M. Co.* 39 Wash. 447, 81 Pac. 915; *Johnson v. So. Pac. Co.* 196 U. S. 1, 25 Sup. Ct. 158; *Walker v. C. C. R. Co.* 135 N. C. 738, 47 S. E. 675; *Mott v. Southern R. Co.* 131 N. C. 234, 42 S. E. 601; *Cogdell v. Southern R. Co.* 129 N. C. 398, 40 S. E. 202; *Thomas v. R. & A. A. L. R. Co.* 129 N. C. 392, 40 S. E. 201; *Carterville C. Co. v. Abbott,* 181 Ill. 495, 55 N. E. 131; *Odin C. Co. v. Denman,* 185 Ill. 413, 57 N. E. 192; *D. H. Davis C. Co. v. Polland,* 27 Ind. App. 697, 60 N. E. 1124; *Island C. Co. v. Swaggerty,* 159 Ind. 664, 62 N. E. 1103, 65 N. E. 1026; *Narramore v. C., C., C. & St. L. R. Co.* 96 Fed. 298; *U. S. C. Co. v. Cooper* (Ind. App.) 82 N. E. 981; *Hailey v. T. & P. R. Co.* 113 La. 533, 37 South. 131; *Murphy v. Grand Rapids V. Works,* 142 Mich. 677, 106 N. W. 211; *Kilpatrick v. G. T. R. Co.* 74 Vt. 288, 52 Atl. 531; *Johnson v. Mammoth Vein C. Co.* 88 Ark.

243, 114 S. W. 722, 123 S. W. 1180; *Coley v. N. C. R. Co.*
129 N. C. 407, 40 S. E. 195; *Lore v. American Mfg. Co.* 160
Mo. 608, 61 S. W. 678.    See, also, the following cases as to
the power of the legislature to abolish the so-called fellow-serv-
ant defense: *Mobile, J. & K. C. R. Co. v. Turnipseed,* 219 U.
S. 35, 31 Sup. Ct. 136; *Ditberner v. C., M. & St. P. R. Co.*
47 Wis. 128, 2 N. W. 69; *Mo. Pac. R. Co. v. Haley,* 25 Kan.
35; *Mo. Pac. R. Co. v. Mackey,* 33 Kan. 298, 6 Pac. 291;
*Bucklew v. C. I. R. Co.* 64 Iowa, 603, 21 N. W. 103; *Mc-
Aunich v. M. & M. R. Co.* 20 Iowa, 338; *Vindicator C. G. M.
Co. v. Firstbrook,* 36 Colo. 498, 86 Pac. 313; *Deppe v. C., R.
I. & P. R. Co.* 36 Iowa, 52; *Peirce v. Van Dusen,* 78 Fed.
693; *Campbell v. Cook,* 86 Tex. 630, 26 S. W. 486; *Thomp-
son v. Central R. & B. Co.* 54 Ga. 509; *Georgia R. Co. v.
Ivey,* 73 Ga. 499; *Mo. Pac. R. Co. v. Castle,* 172 Fed. 841;
*Mo. Pac. R. Co. v. Mackey,* 127 U. S. 205, 8 Sup. Ct. 1161.
Such being its prerogative, it was entirely competent for the
legislature to abolish these defenses in the manner provided
by this act, and to make the abrogation thereof conditional
upon the election of the employer to accept the immunities af-
forded him by the compensatory provisions of the act.    The
inducement or, in other words, the influence exercised by the
act in this respect is not coercive, although it may have a per-
suasive effect.    *State ex rel. Van Alstine v. Frear,* 142 Wis.
320, 125 N. W. 961; *Assaria State Bank v. Dolley,* 219 U. S.
121, 31 Sup. Ct. 189; *Opinion of Justices* (Mass.) 96 N. E.
308.

A brief containing, among other things, a history of com-
pensation acts and a compilation of executive messages, re-
ports of committees and commissions, and other documents,
was filed on behalf of the Industrial Commission by
*C. H. Crownhart, Joseph D. Beck,* and *John R. Commons,*
constituting that Commission.

WINSLOW, C. J.    We are not certainly advised as to the
exact ground on which the decision below was reached, but we

assume that it was on the theory that the law in question was a valid law; that it was retrospective in its effect; and that if the defendant elected to become subject to the act the plaintiffs would be compelled to breach their existing con-- tracts or submit to the terms of the act and thus lose valuable rights; and hence that equity might and should restrain their employer from electing to come under the law until their existing contracts had expired.

It seems to be true that this action might very well be disposed of without considering the question of the validity of the act in question.    Ordinarily under such circumstances that course would be the proper one to pursue, for the question of the constitutionality of a statute passed by the legislature is not one to be lightly taken up, and generally such a question will not be decided unless it be necessary to decide it in order to dispose of the case.    There are circumstances here present, however, which seem to call very loudly for immediate consideration of the question of the validity of the act in question, if under any view of the case it can be considered as involved. The legislature, in response to a public sentiment which cannot be mistaken, has passed a law which attempts to solve certain very pressing problems which have arisen out of the changed industrial conditions of our time.    It has endeavored by this law to provide a way by which employer and employed may, if they so choose, escape entirely from that very troublesome and economically absurd luxury known as personal injury litigation, and resort to a system by which every employee not guilty of wilful misconduct may receive at once a reasonable recompense for injuries accidentally received in his employment under certain fixed rules, without a lawsuit and without friction.

A considerable number of employers have accepted the terms of the act, but unquestionably many are waiting until the question of the constitutionality of the act be authoritatively settled by this court.    Nor is this attitude either blameworthy or surprising.    If an employer elects to accept the act

and proceeds to pay out the sums which it requires for a year or more, and then the act should be declared unconstitutional, it might well be that he would have paid out considerable sums which under the former system he would not be required to pay at all, because he was not negligent, and that he would also be subject to suits to recover additional sums by those who, without contributory negligence, had suffered injury and had received compensation under the law.    The situation is unquestionably one of much doubt and uncertainty among the great industries of the state, and it must remain such until this court has spoken.    Many employers of labor who have not accepted the law have taken that course, not because they have chosen definitely to decline the terms of the law, but because they do not know whether they will be protected if they accept and act under it.    Such a condition of uncertainty ought not to be allowed to exist if it can be removed.    This court cannot properly decide questions which are not legitimately involved in *bona fide* lawsuits,• but it may properly decide all questions which are so involved, even though it be not absolutely essential to the result that all should be decided.    The validity of the statute in question is a matter which may be legitimately considered in the decision of this case.    If the statute be unconstitutional and void, then it is certain that the plaintiffs have no cause of action, because an election to accept the terms of a void statute could harm no one.    Impressed with this view of our duty under the circumstances, we advanced the present case upon the calendar, and invited argument upon the main question as to the constitutionality of the statute, not only from the Attorney General on behalf of the state, but from any attorney interested in the question.    In pursuance of this invitation the Attorney General and the Industrial Commission filed briefs, and oral argument was made by the Deputy Attorney General.    The case has been fully presented, therefore, both by brief and argument, and we are now to consider whether there be any solid foundation for the

attack made upon the law.   In undertaking this task it will be necessary first to set forth in some detail its fundamental provisions.

It adds thirty-two new sections to the Statutes, the first eight of which sections are as follows:

"Section 2394—1. In any action to recover damages for a personal injury sustained within this state by an employee while engaged in the line of his duty as such, or for death resulting from personal injury so sustained, in which recovery is sought upon the ground of want of ordinary care of the employer, or of any officer, agent, or servant of the employer, it shall not be a defense:

"1. That the employee either expressly or impliedly assumed the risk of the hazard complained of.

"2. When such employer has at the time of the accident in a common employment four or more employees, that the injury or death was caused in whole or in part by the want of ordinary care of a fellow-servant.

"Any employer who has elected to pay compensation as hereinafter provided shall not be subject to the provisions of this section 2394—1.

"Section 2394—2. No contract, rule, or regulation, shall exempt the employer from any of the provisions of the preceding section of this act.

"Section 2394—3. Except as regards employees working in shops or offices of a railroad company, who are within the provisions of subsection 9 of section 1816 of the statutes, as amended by chapter 254 of the Laws of 1907, the term 'employer' as used in the two preceding sections of this act shall not include any railroad company as defined in subsection 7 of said section 1816 as amended, said section 1816 and amendatory acts being continued in force unaffected, except as aforesaid, by the preceding sections of this act.

"Section 2394—4. Liability for the compensation hereinafter provided for, in lieu of any other liability whatsoever, shall exist against an employer for any personal injury accidentally sustained by his employee, and for his death, if the injury shall proximately cause death, in those cases where the following conditions of compensation concur:

Borgnis v. Falk Co. 147 Wis. 327.

"1. Where, at the time of the accident, both the employer and employee are subject to the provisions of this act according to the succeeding sections hereof.

"2. Where, at the time of the accident, the employee is performing service growing out of and incidental to his employment.

"3. Where the injury is proximately caused by accident, and is not so caused by wilful misconduct.

"And where such conditions of compensation exist for any personal injury or death, the right to the recovery of such compensation pursuant to the provisions of this act, and acts amendatory thereof, shall be the exclusive remedy against the employer for such injury or death; in all other cases the liability of the employer shall be the same as if this and the succeeding sections of this act had not been passed, but shall be subject to the provisions of the preceding sections of this act.

"Section 2394—5. The following shall constitute employers subject to the provisions of this act within the meaning of the preceding section:

"1. The state, and each county, city, town, village, and school district therein.

"2. Every person, firm, and private corporation (including any public service corporation), who has any person in service under any contract of hire, express or implied, oral or written, and who, at or prior to the time of the accident to the employee for which compensation under this act may be claimed, shall, in the manner provided in the next section, have elected to become subject to the provisions of this act, and who shall not, prior to such accident, have effected a withdrawal of such election, in the manner provided in the next section.

"Section 2394—6. Such election on the part of the employer shall be made by filing with the industrial accident board, hereinafter provided for, a written statement to the effect that he accepts the provisions of this act, the filing of which statement shall operate, within the meaning of section 2394—5 of this act, to subject such employer to the provisions of this act and all acts amendatory thereof for the term of one year from the date of the filing of such statement, and thereafter, without further act on his part, for successive terms of one year each, unless such employer shall, at least

sixty days prior to the expiration of such first or any succeeding year, file in the office of said board a notice in writing to the effect that he desires to withdraw his election to be subject to the provisions of the act.

"Section 2394—7. The term 'employee' as used in section 2394—4 of this act shall be construed to mean:

"1. Every person in the service of the state, or of any county, city, town, village, or school district therein, under any appointment, or contract of hire, express or implied, oral or written, except any official of the state, or of any county, city, town, village, or school district therein, provided that one, employed by a contractor, who has contracted with a county, city, town, village, school district, or the state, through its representatives, shall not be considered an employee of the state, county, city, town, village, or school district which made the contract.

"2. Every person in the service of another under any contract of hire, express or implied, oral or written, including aliens, and also including minors who are legally permitted to work under the laws of the state (who, for the purposes of the next section of this act, shall be considered the same and shall have the same power of contracting as adult employees), but not including any person whose employment is but casual or is not in the usual course of the trade, business, profession, or occupation of his employer.

"Section 2394—8. Any employee as defined in subsection 1 of the preceding section shall be subject to the provisions of this act and of any act amendatory thereof. Any employee as defined in subsection 2 of the preceding section shall be deemed to have accepted and shall, within the meaning of section 2394—4 of this act, be subject to the provisions of this act and of any act amendatory thereof, if, at the time of the accident upon which liability is claimed:

"1. The employer charged with such liability is subject to the provisions of this act, whether the employee has actual notice thereof or not; and

"2. Such employee shall not, at the time of entering into his contract of hire, express or implied, with such employer, have given to his employer notice in writing that he elects not to be subject to the provisions of this act; or, in the event that such contract of hire was made in advance of such employer

becoming subject to the provisions of the act, such employee shall have given to his employer notice in writing that he elects to be subject to such provisions, or without giving either of such notices, shall have remained in the service of such employer for thirty days after the employer has filed with said board an election to be subject to the terms of this act."

Secs. 2394—9 and 2394—10 contain schedules fixing the amounts to be paid by way of compensation in case of disability or death where liability exists under the act, define and classify dependents, and lay down rules for determining the weekly and annual earnings of the injured or deceased employee. Sec. 2394—11 requires the giving of a notice in writing within thirty days after the accident as a condition precedent to the recovery of compensation under the act. Sec. 2394—12 requires that the injured party shall submit to examination by a physician upon request of the employer, or when required by the Industrial Accident Board, and provides a penalty for refusal so to do. Secs. 2394—13 and 2394—14 create an Industrial Accident Board of five members, and define generally the methods of procedure of such board. The next seven sections are as follows:

"Section 2394—15. Any dispute or controversy concerning compensation under this act, including any in which the state may be a party, shall be submitted to said industrial accident board in the manner and with the effect provided in this act. Every compromise of any claim for compensation under this act shall be subject to be reviewed by, and set aside, modified, or confirmed by the board upon application made within one year from the time of such compromise.

"Section 2394—16. Upon the filing with the board by any party in interest of an application in writing stating the general nature of any claim as to which any dispute or controversy may have arisen, it shall fix a time for the hearing thereof, which shall not be more than forty days after the filing of such application. The board shall cause notice of such hearing, embracing a general statement of such claim, to be given to each party interested, by service of such notice on him per-

sonally or by mailing a copy thereof to him at his last known postoffice address at least ten days before such hearing. Such hearing may be adjourned from time to time in the discretion of the board, and hearings may be held at such places as the board shall designate. Either party shall have the right to be present at any hearing, in person or by attorney, or any other agent, and to present such testimony as may be pertinent to the controversy before the board; but the board may, with or without notice to either party, cause testimony to be taken, or an inspection of the premises where the injury occurred to be had, or the time books and pay-roll of the employer to be examined by any member of the board or any examiner appointed by it, and may from time to time direct any employee claiming compensation to be examined by a regular physician; the testimony so taken, and the results of any such inspection or examination, to be reported to the board for its consideration upon final hearing. The board, or any member thereof, or any examiner appointed thereby, shall have power and authority to issue subpœnas, to compel the attendance of witnesses or parties, and the production of books, papers, or records, and to administer oaths. Obedience to such subpœnas shall be enforced by the circuit court of any county.

"Section 2394—17. After final hearing by said board, it shall make and file (1) its findings upon all the facts involved in the controversy, and (2) its award, which shall state its determination as to the rights of the parties. Pending the hearing and determination of any controversy before it, the board shall have power to order the payment of such, or any part, of the compensation, which is or may fall due, as to which the party from whom the same is claimed does not deny liability in good faith within ten days after the giving of notice of hearing provided for in the preceding section; and if the same shall not be paid as required by such order, the facts with respect to the liability therefor, and the determination of the board as to the rights of the parties, shall be embraced in, and constitute a part of, its finding and award; and the board shall have the power to include in its award, as a penalty for noncompliance with any such order, not exceeding twenty-five per cent. of each amount which shall not have been paid as directed thereby.

"Section 2394—18. Either party may present a certified

copy of the award to the circuit court for any county, where-upon said court shall, without notice, render a judgment in accordance therewith; which judgment, until and unless set aside as hereinafter provided, shall have the same effect as though duly rendered in an action duly tried and determined by said court, and shall, with like effect, be entered and docketed.

"Section 2394—19. The findings of fact made by the board acting within its powers shall, in the absence of fraud, be conclusive; and the award, whether judgment has been rendered thereon or not, shall be subject to review only in the manner and upon the grounds following: Within twenty days from the date of the award, any party aggrieved thereby may commence, in the circuit court for Dane county, an action against the board for the review of such award, in which action the adverse party shall also be made defendant. In such action a complaint, which shall state the grounds upon which a review is sought, shall be served with the summons. Service upon the secretary of the board, or any member of the board, shall be deemed completed service. The board shall serve its answer within twenty days after the service of the complaint, and, within the like time, such adverse party shall, if he so desires, serve his answer to said complaint. With its answer, the board shall make return to said court of all documents and papers on file in the matter, and of all testimony which may have been taken therein, and of its findings and award. Said action may thereupon be brought on for hearing before said court upon such record by either party on ten days' notice to the other; subject, however, to the provisions of law for a change of the place of trial or the calling in of another judge. Upon such hearing, the court may confirm or set aside such award; and any judgment which may theretofore have been rendered thereon; but the same shall be set aside only upon the following grounds:

"1. That the board acted without or in excess of its powers.

"2. That the award was procured by fraud.

"3. That the findings of fact by the board do not support the award.

"Section 2394—20. Upon the setting aside of any award the court may recommit the controversy and remand the record in the case to the board, for further hearing or proceed-

ings; or it may enter the proper judgment upon the findings, as the nature of the case shall demand.    An abstract of the judgment entered by the trial court upon the review of any award shall be made by the clerk thereof upon the docket entry of any judgment which may theretofore have been rendered upon such award, and transcripts of such abstract may thereupon be obtained for like entry upon the dockets of the courts of other counties.

"Section 2394—21. Said board, or any party aggrieved by a judgment entered upon the review of any award, may appeal therefrom within the time and in the manner provided for an appeal from the orders of the circuit court; but all such appeals shall be placed on the calendar of the supreme court and brought to a hearing in the same manner as state causes on such calendar."

Sec. 2394—22 regulates officers' fees, costs, and attorneys' fees in the prosecution of claims.    Sec. 2394—23 prevents assignment of the claim before payment and exempts the claim from being taken for debt.    Sec. 2394—24 gives the claim preference over unsecured debts of the employer contracted after the passage of the law.    Sec. 2394—25 provides that the making of a claim under the act shall operate to assign to the employer any 'cause of action in tort which the employee might have against a third party for the injury.    Sec. 2394—26 provides that the act shall not affect insurance companies, nor existing contracts of insurance, nor the right of the employer to insure against liability, and contains other clauses respecting the effect of amounts received by the employee by way of insurance or benefits.    Sec. 2394—27 makes all contracts of insurance subject to the provisions of the act. Sec. 2394—28 provides that the employer may be relieved from liability under the act in a given case either (1) by depositing the present value of the total unpaid compensation, computing interest at three per cent. per annum, with a trust company to be designated by the board, or (2) by the purchase of an annuity approved by the board.    Sec. 2394—29 requires the printing and furnishing of forms for the transac-

tion of the business and the keeping of records by the board, and requires the board to post or publish notices of the employer's election to come under the act. Sec. 2394—30 appropriates a sufficient sum to carry out the provisions of the act; and sec. 2394—31 repeals all inconsistent acts.

Sec. 2394—32 is as follows:

"Section 2394—32. The legislature intends the contingency in subdivision 2 of section 2394—1 of this act to be a separable part thereof, and the subdivision likewise separable from the rest of the act, and that part of said section 2394—1 that follows subdivision 2, likewise separable from the rest of the act; so that any part of said subdivision, or the whole, or that part which follows said subdivision 2, may fail without affecting any other part of the act."

By a later act passed at the same session of the legislature (ch. 485, Laws of 1911), an Industrial Commission, composed of three members, was created, which, among numerous other duties, is required to perform all the duties vested in the Industrial Accident Board aforesaid, and thus the last named board has passed out of existence. *In re Filer & Stowell Co.* 146 Wis. 629, 132 N. W. 584.

The act is quite long, as the complicated and delicate subject with which it deals manifestly requires, but its general purport and effect so far as this case is concerned may be briefly summarized.

It creates an administrative board to carry its provisions into effect; it divides all private employers of labor into two classes: (1) those who elect to come under the law, and (2) those who do not so elect; it takes away the defenses of assumption of risk and negligence of a co-employee from the second class (except that where there are less than four co-employees the latter defense is not disturbed), but leaves both defenses intact to the first class; it prescribes the manner in which an employer may elect to come under its terms, and how an employee may make his election and when silence on the

part of the employee will be considered an election, but it does not in terms compel either employer or employee to submit to its provisions.   It then provides a comprehensive scheme by which, after both parties have so elected, any substantial injury, whether the result be fatal or not, received by the employee in the course of or incidental to his employment (except those caused by wilful misconduct) shall be compensated for by the employer according to certain definite rules, which rules are to be administered by the administrative board aforesaid by means of simple procedure definitely laid down, which gives to both parties fair notice and hearing, and results in findings and an award which may be filed in the circuit court and become a judgment.   It further provides that the findings of fact shall be conclusive and the award subject to review only by action in the circuit court for Dane county, in which it can be set aside only (1) if the Commission acted without or in excess of its powers, (2) if the award was procured by fraud, or (3) if the award is not supported by the findings of fact. It then provides that the judgment thus rendered shall be subject to appeal to the supreme court.

For all the essential purposes of this discussion it may truly be said that this is the law which is before us, and the question is simply whether there is any vital part of it which the legislature may not enact because the constitution forbids it.

It is matter of common knowledge that this law forms the legislative response to an emphatic, if not a peremptory, public demand.   It was admitted by lawyers as well as laymen that the personal injury action brought by the employee against his employer to recover damages for injuries sustained by reason of the negligence of the employer had wholly failed to meet or remedy a great economic and social problem which modern industrialism has forced upon us, namely, the problem of who shall make pecuniary recompense for the toll of suffering and death which that industrialism levies and must continue to levy upon the civilized world.   This problem is

distinctly a modern problem. In the days of manual labor, the small shop with few employees, and the stage-coach, there was no such problem, or if there was it was almost negligible. Accidents there were in those days and distressing ones, but they were relatively few, and the employee who exercised any reasonable degree of care was comparatively secure from injury. There was no army of injured and dying with constantly swelling ranks marching with halting step and dimming eyes to the great hereafter. This is what we have with us now, thanks to the wonderful material progress of our age, and this is what we shall have with us for many a day to come. Legislate as we may in the line of stringent requirements for safety devices or the abolition of employers' common-law defenses, the army of the injured will still increase, the price of our manufacturing greatness will still have to be paid in human blood and tears. To speak of the common-law personal injury action as a remedy for this problem is to jest with serious subjects, to give a stone to one who asks for bread. The terrible economic waste, the overwhelming temptation to the commission of perjury, and the relatively small proportion of the sums recovered which comes to the injured parties in such actions, condemn them as wholly inadequate to meet the difficulty.

In approaching the consideration of the present law we must bear in mind the well established principle that it must be sustained unless it be clear beyond reasonable question that it violates some constitutional limitation or prohibition.

That governments founded on written constitutions which are made difficult of amendment or change lose much in flexibility and adaptability to changed conditions there can be no doubt. Indeed, that may be said to be one purpose of the written constitution. Doubtless they gain enough in stability and freedom from mere whimsical and sudden changes to more than make up for the loss in flexibility; but the loss still remains, whether for good or ill. A constitution is a very

human document, and must embody with greater or less fidelity the spirit of the time of its adoption. It will be framed to meet the problems and difficulties which face the men who make it, and it will generally crystallize with more less fidelity the political, social, and economic propositions which are considered irrefutable, if not actually inspired, by the philosophers and legislators of the time. But the difficulty is that, while the constitution is fixed or very hard to change, the conditions and problems surrounding the people, as well as their ideals, are constantly changing. The political or philosophical aphorism of one generation is doubted by the next, and entirely discarded by the third; the race moves forward constantly, and no Canute can stay its progress.

Constitutional commands and prohibitions, either distinctly laid down in express words or necessarily implied from general words, must be obeyed, and implicitly obeyed, so long as they remain unamended or unrepealed. Any other course on the part of either legislator or judge constitutes violation of his oath of office. But when there is no such express command or prohibition, but only general language, or a general policy drawn from the four corners of the instrument, what shall be said about this? By what standards is this general language or general policy to be interpreted and applied to present-day people and conditions? ·

When an eighteenth century constitution forms the charter of liberty of a twentieth century government must its general provisions be construed and interpreted by an eighteenth century mind in the light of eighteenth century conditions and ideals? Clearly not. This were to command the race to halt in its progress, to stretch the state upon a veritable bed of Procrustes.

Where there is no express command or prohibition, but only general language or policy to be considered, the conditions prevailing at the time of its adoption must have their due weight; but the changed social, economic, and governmental

conditions and ideals of the time, as well as the problems which the changes have produced, must also logically enter into the consideration, and become influential factors in the settlement of problems of construction and interpretation.

These general propositions are here laid down not because they are considered either new or in serious controversy, but because they are believed to be peculiarly applicable to a case like the present, where a law which is framed to meet new economic conditions and difficulties resulting therefrom is attacked principally because it is believed to offend against constitutional guaranties or prohibitions couched in general terms, or supposed general policies drawn from the whole body of the instrument.

Passing to the consideration of the contentions made in the present case, we note *in limine* that this is not a compulsory law: no employer is compelled to pay damages to an employee without having had his day in court.    It is true that the argument is made that the law is practically coercive, but that argument is not regarded by us as sound, and will be taken up and treated later in this opinion.    We are therefore relieved from all consideration of the question whether a compulsory compensation act offends against those clauses of the state and federal constitutions which guarantee all citizens against the deprivation of property without due process of law.    This would be a question of greater difficulty than those which are presented in the present case.    It was decided in the affirmative by the court of appeals of New York (*Ives v. S. B. R. Co.* 201 N. Y. 271, 94 N. E. 431), and in the negative by the supreme court of Washington (*State ex rel. Davis-Smith Co. v. Clausen,* 117 Pac. 1101, decided September 27, 1911), and we express no opinion upon it.

The contention which naturally seems to come first in order is the objection that the whole first section, abolishing the defenses of assumption of risk and negligence of a fellow-servant, is void, because, as it is said, public policy does not re-

quire their abrogation in any but the hazardous trades, it being admitted that in these last named trades these defenses may properly be abolished.

The term "public policy" is frequently used very vaguely, and evidently is so used here. It is, however, quite a definite thing. Public policy on a given subject is determined either by the constitution itself or by statutes passed within constitutional limitations. In the absence of such constitutional or statutory determination only may the decisions of the courts determine it. *Hartford F. Ins. Co. v. C., M. & St. P. R. Co.* 70 Fed. 201; *S. C.* 175 U. S. 91, 20 Sup. Ct. 33. This court has said: "We know of no ground upon which a constitutional legislative enactment can be rightly spoken of as contrary to public policy" (*Julien v. Model B., L. & I. Asso.* 116 Wis. 79, 92 N. W. 561), and the remark is certainly correct. When acting within constitutional limitations, the legislature settles and declares the public policy of a state, and not the court. True, where the legislature has not spoken on a subject and the courts in the course of their duty have declared the principle of common law applicable thereto, public policy may be truly said to be thus created; but any public policy thus created by the courts may be at any time reversed or changed by the legislature, provided it act within constitutional lines. The people, acting directly by means of a referendum, or through their representatives in constitutional conventions or legislative bodies, are the makers of public policy, and it is only when the people have failed to speak in these methods that the courts can be said to have power to make public policy by decision. A constitutional statute cannot be *contrary* to public policy,—it *is* public policy.

The contention that a statute is unconstitutional because it is against public policy amounts to nothing more than a contention that it is unconstitutional, hence we address ourselves directly to that question and thereby gain something in clearness of thought.

. The two defenses which the legislature has thus attempted to take away are not entrenched behind any express constitutional provision, nor were they originally created by legislative action.    They were both evolved by the courts.    At a time when industries of all kinds were comparatively simple and free from danger, when employees of a common master were few in number and generally acquainted with each other, and when a personal injury action was a rarity, it was thought not to be unreasonable that an employee should assume those simple risks which were plainly before him, and should not be heard to complain if he were injured by the careless act of a fellow-workman by whose side he had continued to work when he must have well known the nature and habits of the man. The precedent once made was generally followed, until it became buttressed by a multitude of decisions in practically all of the jurisdictions whose jurisprudence is founded upon the English common law.    But, as has been pointed out earlier in this opinion, the conditions surrounding employer and employed have vastly changed during the last half century, and now the legislature, having become convinced that new conditions call for a change in rules of liability, have declared that such a change shall be made.    They have changed the rule established by the courts because they deem another rule better fitted to deal with the problems of the time, or, in other words, because they deem it best to establish a changed public policy.

It is frankly admitted by appellant that it is within the legislative power to make this change with regard to the hazardous· trades, but not with regard to what are called the nonhazardous trades.    But why not ?    There are, of· course, some occupations which are exceptionally hazardous, and it may well be that it would be within legislative discretion to classify these very hazardous occupations and remove the defenses as to them, while retaining them as to others less hazardous.    Indeed, that very thing has been done and has been approved by

the courts in this and many other states, especially in the case of railroads and to some extent with other industries. *Minnesota I. Co. v. Kline*, 199 U. S. 593, 26 Sup. Ct. 159; sec. 1816, Stats. (1898), as amended by ch. 254, Laws of 1907; *Kiley v. C., M. & St. P. R. Co.* 142 Wis. 154, 125 N. W. 464; sec. 1636*j*, Stats. (1898); sec. 1636*jj*, Stats. (ch. 303, Laws of 1905).

But because there is room for classification it does not follow that legislation without classification is unconstitutional. There are hazards in all occupations; indeed they follow every man from the cradle to the grave. What constitutional requirement, either express or implied, clothes these court-made defenses with exceptional sanctity as to the less hazardous industries, and warns off from them the sacrilegious hand of the legislature? We are referred to none, and we know of none. It is admitted in the *Ives Case, supra,* that both the fellow-servant defense and the contributory-negligence defense, being of judicial origin, may be changed or abolished by the legislature. See, also, the Opinion of the Justices of the Massachusetts Supreme Court on the Personal Injuries Act of 1911, 96 N. E. 308. We see absolutely no ground for the contention that these defenses may be lawfully abrogated as to the more hazardous industries, but must be forever held sacred as to the less hazardous industries. There may be a less persuasive reason for the change in the case of the latter class of industries, but this does not deprive the legislature of the power to make it.

But it is said that there is no proper classification here and hence that the law is fatally discriminating in its character. The two defenses are preserved intact to employers who elect to come under the law and taken away from those who do not so elect.

The rules governing classification are familiar and are in brief as follows: It must be based on substantial distinctions which make real differences; it must be germane to the pur-

poses of the law; it must not be limited to existing conditions only; and must apply equally to each member of the class. It seems to us that this classification fully meets these requirements. Certainly there will be very real differences between the situation of the employer who elects to come under the law and the employer who does not. If the consenting employer only employs workmen who also elect to come under the law, he can never be mulcted in heavy damages, and will know whenever an employee is injured practically just what must be paid for the injury. Surely this is a different situation from the situation of the man who is liable to be brought into court by an injured employee at any time and obliged to defend common-law actions upon heavy claims unliquidated in their character, the outcome of which actions none can foretell. On the other hand, if, as seems quite likely, the greater part of the consenting employer's workmen consent, but some do not, and these latter are still retained in the employment, the same considerations will apply with somewhat less force. On the one hand there is a class of consenting employers employing wholly or largely consenting workmen, and having definite and fixed obligations to their workmen in case of injury. On the other hand is a class of nonconsenting employers who have no such fixed obligations in case of injury to their workmen, but choose to meet every such workman in court and fight out the question of liability. There seems a very robust difference between these two classes. But after all there is another distinction which seems perhaps more satisfactory: the consenting employer has done his share, and it must be considered a considerable share, in rendering successful the legislative attempt to meet and solve a difficult social and economic problem. Even if it be true (which, as before stated, is not decided) that he may not be compelled under our constitutions, state and national, to assist in the solution of this problem, still does not his voluntary act in giving that assistance constitute a substantial

distinction, making a real difference of situation between him and the employer who refuses his aid—a difference which justifies a difference in treatment?

It seems to us that this question must be answered in the affirmative, and if it be so answered there can be no doubt as to the legitimacy of the classification, for the reason that it. is quite apparent that the other conditions of valid classification are fully satisfied. There can be no doubt that the classification is germane to the purpose of the law, and it is not limited in its application to existing conditions only, and applies equally to each member of the class.

The minor classification by which the fellow-servant defense is preserved to all employers employing less than four employees in a common employment is also attacked as having no proper legal basis, but it seems to us that the grounds of classification here are more persuasive even than in the case just discussed. The man who is employed with one or two other men in a given employment, in all reasonable probability knows their characteristics well and will probably be with them a great part of the time. He will have ample opportunity to form a just judgment as to the risk of injury from their negligence which he will run if he works with them, and will be enabled to shape his own conduct accordingly; but the man who is one of a large number of men, many of whom he never sees, and some of these latter having duties to perform in distant places upon the due performance of which his own safety depends, has no opportunity to acquire any accurate knowledge of the characteristics of many of his fellow-workmen, and cannot intelligently decide what risk he runs at the hands of such distant and unknown employees. The difference in situation is not merely fanciful—it is real. In one case the employee knows or has the means of knowing what to expect from his colaborers, in the other case he has neither the knowledge nor the means of knowledge. Of course, there will be cases on the border line

where the difference in situation will be very slight, or perhaps entirely nonexistent.    There will probably be no practical difference between the situation of the man who is one of four or five employees in a given employment and the situation of the man who is one of three, but this does not militate against the legitimacy of the classification: this is a necessary defect in all cases of classification based upon numbers. The question is not whether there may be some on one side of the line whose situation is practically the same as that of some on the other side, but whether there is a "distinction between the classes as classes, whether there are characteristics which, in a greater degree, persist through the one class than in the other which justify legal discrimination between them."    *State v. Evans,* 130 Wis. 381, 110 N. W. 241.

Passing from these questions of classification, we meet the objection that the law, while in its words presenting to employer and employee a free choice as to whether he will accept its terms or not, is in fact coercive, so that neither employer nor employee can be said to act voluntarily in accepting it.

As to the employer, the argument is that the abolition of the two defenses is a club which forces him to accept; and as to the employee, the argument is that if his employer accepts the law the employee will feel compelled to accept also through fear of discharge if he do not accept.

Both of these arguments are based upon conjecture.    Laws cannot be set aside upon mere speculation or conjecture. The court must be able to say with certainty that an unlawful result will follow.    We do not see how any such thing can be said here.    No one can say with certainty what results will follow in the practical workings of the law.    It may well be that many manufacturers, especially those employing small numbers of employees and in the less dangerous trades, will deliberately conclude that it will be better business policy to exercise greater care in guarding their employees from possible danger and greater discrimination in the employment of

careful men, and reject the law entirely, running the risk of being able to prevent all or nearly all accidents. It seems extremely probable that the great bulk of workmen, especially of the unskilled classes, will be glad to come under the act and thus secure a certain compensation in case of injury, in place of that very uncertain and expensive thing, namely, the final result of a lawsuit. But whether this be so or not, it may be considered as reasonably certain that very many will elect to come under the act voluntarily and freely, and that those who do not will probably come from the ranks of skilled labor, who will deem the rates of compensation under the law as entirely inadequate, or will be careful workmen in the less dangerous trades who will see no gain in bartering their common-law rights for the restricted remedies furnished by the statute. It cannot be said with any certainty that such men will be discharged for their failure to voluntarily come under the law. The probability would seem rather to be that they would be of a class which the employer would wish to keep in his employ, notwithstanding their attitude toward the law. These matters are, however, purely speculative and conjectural; none can say what the practical operation of the law will be. It is enough for our present purpose that no one can say with certainty that it will operate to coerce either employer or employee.

We thus reach the conclusion that there are no valid constitutional objections to the first section of the law in question, and this conclusion obviates the necessity of any consideration of the provisions of sec. 2394—32, which aims to preserve the balance of the law intact in case the whole or some part of sec. 2394—1 should be considered invalid. We may say in passing that we know of no good reason why the legislature may not declare its intention that one part or section of a law is not a compensation for and that it may be separated from the balance of the act for the very purpose of saving such balance from being invalidated in case the first

named part or section be held unconstitutional.   We think it would take a very extreme case of palpable absurdity or falsity in such a provision to justify any court in declaring such a declaration of legislative intent ineffective, if indeed a court could make such a declaration at all.

The next important contention is that the law is unconstitutional because it vests judicial power in a body which is not a court and is not composed of men elected by the people, in violation of those clauses of the state constitution which vest the judicial power in certain courts and provide for the election of judges by the people, as well as in violation of the constitutional guaranties of due process of law.   It was suggested at the argument that the Industrial Commission might perhaps be held to be a court of conciliation, as authorized to be created by sec. 16 of art. VII of the state constitution, but we do not find it necessary to consider or decide this contention.   We do not consider the Industrial Commission a court, nor do we construe the act as vesting in the Commission judicial powers within the meaning of the constitution.   It is an administrative body or arm of the government which in the course of its administration of a law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts *quasi*-judicially, but it is not thereby vested with judicial power in the constitutional sense.

There are many such administrative bodies or commissions, and with the increasing complexity of modern government they seem likely to increase rather than diminish.   Examples may be easily thought of,—town boards, boards of health, boards of review, boards of equalization, railroad rate commissions, and public utility commissions all come within this class.   They perform very important duties in our scheme of government, but they are not legislatures or courts. The legislative branch of the government by statute determines the rights, duties, and liabilities of persons and corporations under certain conditions of fact, and varying as the

facts and conditions change. Manifestly the legislature cannot remain in session and pass a new act upon every change of conditions, but it may and does commit to an administrative board the duty of ascertaining when the facts exist which call into activity certain provisions of the law, and when conditions have changed so as to call into activity other provisions. The law is made by the legislature; the facts upon which its operation is dependent are ascertained by the administrative board. While acting within the scope of its duty, or its jurisdiction, as it is sometimes called, such a board may lawfully be endowed with very broad powers, and its conclusions may be given great dignity and force, so that courts may not reverse them unless the proof be clear and satisfactory that they are wrong. *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Commission,* 136 Wis. 146, 116 N. W. 905. Not only this, but many such boards are created whose decisions of fact honestly made within their jurisdiction are not subject to review in any proceeding. *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587; *State ex rel. Vilas v. Wharton,* 117 Wis. 558, 94 N. W. 359; *State ex rel. Cook v. Houser,* 122 Wis. 534, 561, 100 N. W. 964; *State ex rel. McManus v. Trustees,* 138 Wis. 133, 119 N. W. 806. It is important to notice the limitation contained in the last sentence: the decision of such a board may be made conclusive when the board is acting within its jurisdiction, not otherwise. Hence the question of its jurisdiction is one always open to the courts for review; it cannot itself conclusively settle that question and thus endow itself with power. If no appeal from its conclusions be provided, the question whether it has acted within or exceeded its jurisdiction is always open to the examination and decision of the proper court by writ of *certiorari.* The instances where the question of jurisdiction of such bodies has been examined and decided in *certiorari* actions are so numerous that it seems unnecessary to cite them. In such cases it is considered that

clear violations of law in reaching the result reached by the board, such as acting without evidence when evidence is required, or making a decision contrary to all the evidence, constitute jurisdictional error and will justify reversal of the board's action, as well as the failure to take the proper steps to acquire jurisdiction at the beginning of the proceeding. *State ex rel. Augusta v. Losby,* 115 Wis. 57, 90 N. W. 1135.

Thus, in the case before us, the jurisdiction of the Industrial Commission to entertain any claim for compensation under the act rests upon two facts which must exist, viz.: (1) that both employer and employee have elected to come under the act, and (2) that the injury was received in service growing out of or incidental to the employment as the result of accident, and not of wilful misconduct.

The Industrial Commission must, of course, decide these questions in any case where they are raised, but it cannot decide them conclusively, for they are jurisdictional questions on which its right to act at all depends. They must be open to review in some court of competent jurisdiction, otherwise the parties would be denied due process of law. The tribunal only has authority over those who have voluntarily elected to give it authority, and if it can decide finally that a man has given consent when he has not it assumes the functions of a court. If the act before us took away from the courts the power to consider these jurisdictional questions, either expressly or by necessary implication, the contention that judicial power had been vested in the Commission, contrary to the command of the constitution, would be of greater force, but we think that the act does not do this, or attempt to do it. True, it says that the findings of fact made by the Commission shall, in the absence of fraud, be conclusive; but it provides for an action in the circuit court for Dane county, in which the board's award may be set aside upon either of three grounds, viz.: (1) that the board acted without or in excess

of its powers; (2) that the award was procured by fraud; and (3) that the findings of fact do not support the award(*error of law*)

We regard the expression "without or in excess of its powers" as substantially the equivalent, or at least as inclusive, of the expression "without or in excess of its jurisdiction," as those words are used in *certiorari* actions to review the decisions of administrative officers and bodies. We know of no other construction that can be logically given to them, and it seems to us that they were designedly and advisedly inserted by the framers of the bill to meet the very objection which is now made. With this construction, it is certain that the constitutional powers of the courts have not been invaded, and that no man without his consent can be brought under the law or is deprived of his right to "due process of law" thereby.

There are some further objections which will be more briefly considered. It is said that even if it be held that the act is not coercive, still when employer and employee consent to come under the law they in effect wholly stipulate away their rights to resort to the courts, and that such agreements are void, citing *Fox v. Masons' F. Acc. Asso.* 96 Wis. 390, 71 N. W. 363. The case cited, however, recognizes the companion principle that agreements to arbitrate special matters, such, for instance, as the amount of the loss under an insurance policy (or, as in the present case, the extent of an injury or disability, and the like), which do not go to the whole groundwork of the controversy, are universally sustained. As we have seen, these special matters are the only matters which the board may conclusively decide under this law. If there be a controversy as to fundamental rights, namely, whether the parties have consented, or as to whether the injuries resulted from wilful misconduct, these issues are still open to the court upon the appeal.

In considering the question as to how far consent may go in matters of this kind, a case not cited in the briefs or men-

tioned in the oral argument should, we think, be referred to
here, viz.: the case of *Van Slyke v. Trempealeau Co. F. Mut.
F. Ins. Co.* 39 Wis. 390. In this case it appeared that the
legislature had passed a law providing that in case of the
filing of an affidavit of prejudice against a circuit judge the
parties might, if they chose, stipulate that a member of the
bar should act as judge and try the case with all the powers
of the regularly elected judge of the court. Acting on this
law, the parties in the case agreed that Mr. John J. Cole
should try the case, and he did so, rendered judgment for the
plaintiff, and the defendant appealed. The court held
(Chief Justice RYAN writing the opinion) that, the constitu-
tion having vested all the judicial power of the state in the
courts and provided for the election of judges for such courts,
the legislature could confer no judicial power on other offi-
cers or persons, nor authorize the parties to an action to do
so, hence there was no trial before a court, and no judgment.
The question as to whether the defeated party might not be
prevented from raising any objection by his voluntary waiver
was not considered or mentioned; but in any event the case
has no bearing here, and is only mentioned in order to show
that it has not been overlooked. It only decides that neither
the legislature nor private parties can make a judge out of a
private citizen and endow him with the power to hold a court
contrary to the direct command of the constitution. As the
Commission in the present case is not a court, but simply an
administrative board, the doctrine laid down in the case cited
has no application.

Again, it is said that the act compels municipalities to levy
taxes for other than public purposes, since all workmen in-
jured in the employ of the public are to be compensated, and
thus taxpayers will be deprived of their property without
due process of law. We have not been quite able to appre-
ciate the force of this point, and we find no argument upon it
in the brief. We shall only say that the manner in which the

state or the public shall treat its workmen is peculiarly a matter for the legislature to determine. No one is compelled to work for the public, and, if he does, he takes his situation on the terms which the public gives. We know of no reason why the public, acting by its lawmaking power, may not provide that its employees shall have as part of their compensation certain indemnities in case of accidental injury in the public service. When a law does so provide, the raising of the funds to discharge those indemnities becomes plainly a proper public purpose.

Objection is made to those clauses of sec. 2394—16 which provide for the giving of notice of claim by mail, and allow testimony to be taken without notice to either party, and the claim is made that this is not "due process of law." Were the Commission a court these objections would probably deserve serious consideration, especially the latter one. But, as we have seen, the Commission is an administrative board merely. It is common knowledge that such boards are frequently given power to investigate and determine facts without notice to the parties of each successive step in the proceedings. The proceedings before such boards are not expected to be as formal and cumbrous as the proceedings of courts; indeed, the greater flexibility which such bodies must possess if they are to discharge their duties seems to demand greater freedom of action. If notice, either actual or constructive, of the commencement of the proceedings before such a body be required to be given to the parties interested and they be given full and free opportunity to be heard and present evidence, it is generally held sufficient, even though notice of intermediate steps in the proceeding be not required or given. *Schintgen v. La Crosse,* 117 Wis. 158, 94 N. W. 84. In case of a board like the present, which only acts on the rights of parties who have consented that it may so act, the reason of the rule is far stronger.

Some contention is made in the brief that minors cannot be

treated in the same manner as adults, and that the provision of the law which declares that a minor who is legally entitled to work shall have the same power of contracting for service as an adult is objectionable, because it allows the employer to decide whether the law shall treat his minor employees as adults. The objection seems to us fanciful and elusive. There is no claim that the legislature may not endow minors with the right to make contracts otherwise lawful, and, if this be so, it seems to us to be the end of the discussion. After the minor is so endowed he becomes for the purposes of the act an adult, or at least on the same plane. No adult employee of a private employer can elect to come under the act unless his employer has first elected to do so. So the employer has the power to decide whether any of his employees, infant or adult, shall have the privileges of the act if they continue to work for him. This is practically all there is of the matter, and we see no substantial distinction between the effect of the law upon the adult and its effect upon the minor.

The foregoing considerations are believed to fully meet and dispose of all the objections made to the law which could reasonably be claimed to be fatal to the entire law if sustained. There are many objections made to single sections or clauses of the law which we do not find it necessary or advisable to treat at this time. Even should some or all of them be sustained, it is our judgment that the sections or clauses so questioned could not be said to be so far compensations for or inducements to the balance of the law that the entire law must fall. In our judgment it is better to reserve these questions for consideration when an actual case arises which calls for the decision of the court upon them. It is well-nigh impossible for the human mind to call up and contemplate in advance all the considerations which ought to be considered in passing upon the validity of the various incidental clauses of a new and complicated law. The concrete case and its actual circumstances and effects are apt to throw much light

upon the question and suggest considerations wholly un-
thought of when viewing the matter abstractly in advance of
any actual experience.

Among these contentions which we now pass without de-
cision, perhaps the most important is the contention that so
much of sec. 2394—16 as provides that the board or any
member thereof, or *any examiner appointed thereby,* shall
have power to issue subpœnas, obedience to which shall be en-
forced by contempt proceedings in the circuit court. This
seems to present a serious question worthy of careful exami-
nation, and we intimate no opinion upon it now.

Other minor contentions, which we do not consider it neces-
sary or advisable to pass upon now, are to the effect that the
clauses are void which empower the Commission (1) to de-
clare and enforce penalties against the employer for failure
to perform certain orders of the board made pending hearing
(sec. 2394—17) ; (2) to set aside or modify contracts of set-
tlement previously made by the parties (sec. 2394—15) ; and
(3) to regulate the amount of contingent attorney's fees and
permit one claimant to make a contract which it may refuse
to allow another to make (sec. 2394—22).

Before closing we shall briefly refer to another question
which was not much discussed on the argument, namely, the
question whether the law applies or was intended to apply to
persons who, like the plaintiffs, are employed under contracts
of service made prior to the passage of the law, and which do
not expire until some definite date in the future, and, if so,
whether the law can apply to them without impairing the ob-
ligations of their contracts, and thus violating the constitu-
tion. As to the first branch of this question, we think that
the language of the act leaves no doubt as to the intention of
the legislature. The entire act by express terms was to be-
come effective September 1, 1911. Its provisions are broad
and without express exception. Read according to their
grammatical meaning, they include all employers and em-

ployees who occupy those relations at the time the law becomes effective. If there was an intention to exclude any from its terms, that intention has been carefully concealed. We conclude that it was intended to include all employers and employees, whatever the term of service. The question whether the act as so construed affects an existing contract of service expiring at some distant period in the future is easily answered in the negative, as it seems to us. Certainly the law does not affect the service to be rendered or the wages to be paid in any way. Neither the obligation of the workman to faithfully do his work, nor the obligation of the employer to faithfully pay the stipulated wage, nor the remedy in case of breach by either party, is in any way affected. What, then, is affected? Plainly no provision of the contract. But, if the employer elects to come under the law, the employee must choose whether he will come under it or not, and if he does not wish to come under it he may run the risk of being discharged, or if he wishes to retain his employment he may feel compelled to elect to come under the law and thus lose his right to bring an action at law in case of a personal injury sustained in the employment. But all this does not in any way affect the contract of employment; that remains absolutely unimpaired in all its terms. The right to bring an action in the future in case of a possible tort not yet committed is no part of the contract of employment. That right arises out of the relation of employer and employee and is subject to change by the lawmaking power at any time. The employer does not contract that it shall remain intact. There is no vested right in a mere remedy for a hypothetical wrong. At most the law cannot be said to do more than change the remedy for a tort which is yet to happen, and may never happen. The legislature may change the remedies for torts yet to be committed at any time, and such changes cannot be said to make any change in mere contracts of service existing between the parties. This seems very patent. The legislature has at many times within the last two decades

passed laws very materially changing the liabilities of employers to employees for injuries resulting from the negligent acts of the employer, e. g. the laws requiring the protection of machinery, abolishing assumption of risk in such cases, abolishing the co-employee rule as to railway companies, and changing the rules as to contributory negligence. In no case has the claim ever been made that these laws in any way affected or impaired existing contracts of service for terms expiring in the future, although many cases must doubtless have occurred where those laws were applied to parties who were under such contracts.

We have now discussed all of the contentions made against the law which we deem entitled to detailed treatment, and we find no serious difficulty in sustaining its fundamental and essential provisions. As said in the beginning of this opinion, this law forms the answer of the legislature to a very widespread demand. It is a legislative attempt to reach within constitutional lines some fair solution of a serious problem which other nations, not restricted by written constitutional inhibitions, have solved or partially solved years ago. Doubtless the law will need and will receive changes and amendments as time shall test its provisions and demonstrate its weak points. It would be unreasonable to expect that a law covering so important a subject along lines not before attempted should be perfect, or very near perfect, upon its first enactment. If experience shall demonstrate that it is practicable and workable and operates either wholly or in great measure to put an end to that great mass of personal injury litigation between employer and employee, with its tremendous waste of money and its unsatisfactory results, which now burdens the courts, the long and painstaking labors of those legislators and citizens who collaborated in framing it will be fittingly rewarded by a result so greatly to be desired. That result will mean a distinct improvement in our social and economic conditions.

The effect of our conclusions upon the result in the present

case is yet to be considered. The complaint was sustained and the injunction granted on the ground apparently that, the law being valid, the plaintiffs would·be greatly injured if their employer elected to become bound by it, because they would be obliged either to break their existing contracts or lose their common-law remedies for their employer's torts. Granting all that plaintiffs claim as to the necessary results of their employer's election, it is very certain that no irreparable injury results to them. If their employer breaks his contract of employment because they decline to accept the new law, they have adequate legal remedies for the recovery of damages. If, on the other hand, they elect to come under the law themselves, they lose no vested or contract right, and are not damaged in the eyes of the law by the change in their remedies for future torts. In either event there is no cause of action in equity, and no ground for an injunction. The complaint should have been dismissed on the pleadings.

*By the Court.*—Judgment reversed, and action remanded with directions to dismiss the complaint.

The following opinion was filed November 16, 1911:

BARNES, J. (*concurring*). I concur in the opinion of the Chief Justice except in so far as it is said in effect that our constitutions may mean one thing today and something different tomorrow, depending on whether conditions and ideals have in the meantime undergone a change. I regard our constitutions as immutable except when changed in the manner therein prescribed. Judges in interpreting our fundamental laws may at one time reach conclusions different from those which would be reached at another time. This does not argue that the constitutional provision under consideration has undergone any change, but demonstrates that judges, being finite beings, made a mistake at one time or the other. No act of the legislature should be declared unconstitutional

unless it is clearly so. This is elementary. By hewing closely to this line, there is little danger of the courts committing any serious blunders in interpreting our organic laws. If a legislative act measured by this standard trenches on the constitution, it should be held void regardless of whether or not the provision violated is out of harmony with twentieth century conditions and ideals. To hold otherwise is to say that the courts may change our fundamental laws. This would be a clear usurpation of power never vested nor intended to be vested in the courts, and one which was reserved to the people themselves. I am a firm believer in constitutional government. I do not share the belief that our constitutions have become archaic or that they have outlived their usefulness. If the opinion of the court is intended to mean that it is a doubtful question whether our constitution should be preserved or thrown in the "scrap heap," I do not agree with it.

The following opinion was filed November 22, 1911:

MARSHALL, J. (*concurring*). The result, itself, meets with my unqualified approval. Some language in the court's opinion, however, respecting the constitution, I fear will be construed in a different way than the writer thereof, or any member of the court, intended or would sanction, tending to impair the lofty character of the fundamental law as significantly maintained by this court. I am not alone in that. Other language appears which does not express my personal views. True, none of such is matter of decision or even judicial *dicta*, but if left unchallenged, it is liable to misleadingly indicate a trend of judicial thought here which, I am safe in saying, does not exist. I choose to avoid responsibility therefor. It, seemingly, is my duty to do so. In discharging that duty I wish not to take from the dignity of the court's able opinion on the vital questions presented for solution. I

do not understand they involved any new constitutional, or any question of difficulty, giving rise, under any circumstances, to desire a broader fundamental spirit than has been long firmly entrenched in the jurisprudence of this country.

The law approved is a very mild piece of legislation. While I would not suggest it is too moderate for now,—for that is not within my province,—yet I would not indicate that the legislature responded as fully as it might to the need for a system as directly as practicable, laying the personal injury burdens of production upon the things produced, where they belong, as should have been efficiently recognized long ago, and would have been had the lawmaking power appreciated that it is its province, not that of courts, to cure infirmity in the law. If criticisms, unjustly and freely directed toward the latter and the human instrumentalities thereof, merely because of their fidelity to duty to maintain the laws as given, had been turned upon the former for failure to better conserve human happiness in the industrial field in the light of twentieth century conditions, untold suffering might have been prevented, which only the people's representatives could prevent. Tardy recognition of such duty casts no reflection upon legislative actors of today. Who can say but that they would have had the same ideals as now, and effected the same results long ago if opportunity had been offered them to do so? It has been, in the past, far easier to criticise a power which was helpless to supply a remedy, than to suggest one or move legislative power to adopt one.

I am constrained to write the foregoing to give deserved credit to the patient, earnest, efficient labor of the lawmakers who placed the enactment in question upon the statute book of this state. It would give them too little credit to record, merely, that they bowed to public demand, and too little credit to this court to leave room for the thought that it has been influenced by any such demand to give the constitution any new shade of meaning to sustain the enactment, or that it would change, or arrogate to itself, power or disposition to

change, fundamentals in any sense, by judicial interpretation.

As to the subject of the enactment, advanced thinkers in economics, law, and legislation have been at the front and the public has been slow to follow. It took the industrious, able, patient, tactful legislative committee over two years of activity, to educate the people up to willingness to accept on trial the mild law before us. Opposition had to be overcome by education on all sides. The legislature responded not so much to a general demand, as to a constitutional command, to conserve, in the light of the present, the public welfare.

The remarks in the court's opinion which may suggest to some that a different meaning is to be read out of the constitution now than formerly; that it may have meant one thing when framed and later another, and now be held differently, according to judicial interpretation to meet social necessities as recognized by human instrumentalities in the particular environment,—probably was not so intended, but I sense danger of a contrary impression going out. Such ability to bend the fundamental law in the name of judicial interpretation,— the idea that an eighteenth century construction for an eighteenth century condition may not, and at the hands of the court does not have to, fit a twentieth century condition,— has been advanced by some, but not significantly at least by any court. On the contrary, it has met with universal condemnation. That it is wrong, every man of eminence that has ever written upon the subject in the past, as well as the very nature of the case and the very logic and limitations of judicial interpretation, bear witness. The fertile method of dealing with the constitution has been characterized as one which has "furnished a mode of argument which would on the one hand leave the constitution crippled and inanimate, or on the other give it an extent of elasticity subversive of all rational boundaries." Story, Const. 389.

Manifestly, there can be but one right interpretation or

construction of the constitution. It is said to have been constructed of general declarations, so that, in letter and spirit, it might abide indefinitely and would have to so abide, dealing with all conditions and all ages, except as amended in the manner therein specified. Considerately with that, there can be but one viewpoint for interpretation, and that is the one from which the framers of the system builded. That is unmistakably indicated in *Marbury v. Madison,* 1 Cranch, 137 ; *Martin v. Hunter's Lessee,* 1 Wheat. 304.

We speak of the constitution in a general sense,—the American system, commencing with the federal model and including the state constitutions framed in harmony therewith. In all writings thereon, from Chief Justice MARSHALL to date, the idea that it cannot be properly judicially changed to suit the notions of the times, and that there will appear little need therefor when the real nature thereof is comprehended, is made prominent. It was that idea, largely, which moved one eminent writer to speak of it as the "greatest single achievement of the eighteenth century," and another to characterize it as the "most wonderful work ever struck off at a given time by the brain and purpose of man." Truly, it cannot be said of that which was so unequaled in the eighteenth century, and, we may well add, was unequaled in the nineteenth and has been since, that it can take the cast, so to speak, from time to time of its environments as judicial instrumentalities may view it through the vista of conditions *in præsenti.* All history says No. The very inconsistency of the contrary says No. The absence of any necessity for, and the destructive danger of, any such quality say No.

A new remedy for a new condition within the boundaries of reason is within legitimate police authority. Who could wish more ? How could more exist and human liberty,—natural, inherent rights be safe ? Would it not be well to recur to the classic rule for testing legitimacy of legislative enactments, given by the most eminent judicial expounder of

the constitution of which the history of American jurisprudence bears record:

"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCullough v. Maryland,* 4 Wheat. 316, 421.

With that and the significance of the declared purpose and central thought of the constitution in mind, much of the supposed difficulty which has stimulated suggestions of competency to, and necessity for, bending it by a usurpatious method of interpretation, will disappear.

How are we to determine when the purpose of a law, in the field of police power, and unaffected by any express prohibition, is legitimate? It seems the answer is easy. Look first to the purpose of the constitution, found in the declaration, "Grateful to Almighty God for our freedom, in order to secure its blessings, form a more perfect government, insure domestic tranquillity and promote the general welfare," we "do establish this constitution." [Const. Preamble.] Then to the central thought,—the very substructure,—upon which the whole was builded: "All men are born equally free and independent, and have certain inherent rights; among these are life, liberty, and the pursuit of happiness." [Const. art. I, sec. 1.] There is voiced a broad spirit, covering as this court has, in effect, many times said, a field as limitless as are human needs. The language was not used for mere rhetorical ornamentation or effect, but to suggest the permissible scope of legislation in the zone of general welfare, its extent and its limitations. *Durkee v. Janesville,* 28 Wis. 464, 471; *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098; *State v. Redmon,* 134 Wis. 89, 114 N. W. 137; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885.

So here, as it seems, the initial question was this: Is the purpose of the law legitimate, within the broad dominating

spirit mentioned? The answer must be Yes, as the manifest purpose is to promote every element of the central thought of the constitution. Anything fairly within that has always been and must, necessarily always, be held legitimate. Keeping in mind that in the selection of means the legislature has a very broad comprehensive field in which to freely make a choice, the next question is, Are the means contemplated reasonably appropriate to the end to be attained? Not are they the best means, but are they proper means, in that they are not within any express prohibition and tend to conserve rather than to destroy? All must agree in the affirmative on that in harmony with the best thought of all the more civilized nations of Europe. The difficulty here has been, want of appreciation of the great economic truth, that personal injury losses incident to industrial pursuits, as certainly as wages, are a part of the cost of production of those things essential to or proper for human consumption, and the more directly they are incorporated therein the less the enhancement of cost and the better for all.

True, the old remedies for losses mentioned have been inefficient and wasteful. They are, economically speaking, unscientific and have always been. It is more apparent now than formerly by reason of greater and more numerous modern activities and methods, that is all. In truth, the infirmity from an economic standpoint, and from the standpoint of man's duty to his fellow men, has always existed, though the *quantum* of regrettable results and useless waste has greatly increased by the multiplication of human activities and physical instrumentalities.

So it will be seen, I think, that while particular means may be reasonably appropriate to a legitimate purpose under some conditions characterizing a particular period, and not have been at a prior time, no change in the constitution is involved in remedying the misfit. The end being proper the legitimacy of means may be dependable upon conditions, the ques-

tion turning more on matter of fact than anything else. The change of mere means does not require a fundamental change, so long as legitimacy of end and reasonable appropriateness of means shall be kept efficiently in view.

Want of appreciation, in my judgment, of the constitution from the viewpoint suggested, has led some to advocate judicial changes to meet new conditions, while others have insisted that many amendments, made in the prescribed way, practically substituting a new system for that of the Fathers, are necessary or advisable, and still others have maintained the broad liberal view suggested, which was early entrenched in the jurisprudence of this country by the judicial writings of Chief Justice JOHN MARSHALL. That idea renders changes of any kind unnecessary to legislative competency to legislate to any extent which reasonably promotes a constitutional object. Anything further would destroy, or tend to destroy, instead of promote public welfare. Such idea is the safe one and the right one from the viewpoint, I think, of the Fathers. It is the one sturdily maintained by this court. It is the one I feel competent to say, all members of this court would now maintain and that nothing in its opinion should be otherwise taken.

If the constitution is to efficiently endure, the idea that it is capable of being re-squared, from time to time, to fit new legislative or judicial notions of necessities *in præsenti,* instead of new legislation being tested by it, must be combated whenever and wherever advanced, and wrong impressions in regard to the matter carefully guarded against. To even, significantly, speak of making the constitution adaptable to new conditions by means of interpretation, when the selection of new and constitutional means, adaptable to such conditions, is meant, is liable to confuse and weaken that high regard all should have for the fundamental law as a broad, definite, certain, comprehensive, unvarying and unvariable system, other than by the means therein pointed out. Dark

will be the day, if that day will ever come, for the people of this country, and dark to the people of all countries whose attention is directed here for lessons in constitutional government, when our system shall not be held up by the courts as speaking the same at one time as at the other, except in so far as changes shall be made in the particular way. That is. the doctrine of *Marbury v. Madison,* 1 Cranch, 137. No one can read that great exposition of our system without appreciating how illogical it is to speak of interpretation as an instrumentality for giving, from time to time, a different cast to the fundamental law. The whole spirit of the court's logic condemns such reasoning as heresy. Note the significance of this: "The exercise of this original right" to make a system of government "is a very great exertion; nor can it. nor ought it to be frequently repeated. The principles, therefore, so established, are deemed fundamental. And as the authority from which they proceed is supreme, and can seldom act, they are designed to be permanent." In that connection the court added, in unanswerable logic, that the constitution is not only the paramount law but is absolutely unchangeable by ordinary means; that laws adaptable to it. are legitimate, and laws so called, not so adaptable, are not laws at all. It was designed to govern the legislature and the courts as well. That conception is of something high above either legislatures or courts, to vary it. How can that be done by indirection, miscalled interpretation and construction,—a method of rounding a syllogism with a conclusion based on false premises? Interpretation of that sort would enable courts to evade and render useless the most carefully drawn enactments whether of fundamental or subsidiary law.

So, in short, I think the law in question is a reasonably appropriate means to effect a constitutional purpose; that the constitution needs no bending whatever in order to sustain it in its essential features, and none would be proper if the contrary were the case.

The foregoing I can but regard out of harmony with this, in its letter: "changed social, economic, and governmental conditions and ideals of the time, as well as the problems the changes have produced, must logically enter into the consideration and become influential factors in the settlement of problems of construction and interpretation," so far as it is pregnant with the thought that the fundamental law is judicially changeable. The words "problems" of "construction" and "interpretation," I think were unfortunately used, if the thought was merely of problems of whether new enactments to cope with new conditions are within or without the legitimate field of legislative activity, having regard to appropriateness of means to effect a constitutional end. The latter might be, as I have suggested, at one time and not a half century theretofore, because changed conditions may render an end legitimate, within the unchangeable scope of the fundamental law, which earlier was not, or the selected means to effect that end might be reasonably appropriate at one time, though not so a century, more or less, theretofore.

Why treat judicial interpretation of law as a process of following changing ideals, social problems, and ideas, since its sole office is to solve uncertainties as to the intent at the time of the enactment? Interpretation commences where begins uncertainty,—obscurity as to the meaning the lawgivers purposed putting into the enactment and succeeded, discoverably, in expressing, literally or inferentially. In short, the gist of the matter is the intent when the law was made, not what one can make the language say in a different environment from that of its origin to accomplish a desired purpose. No bending is permissible for the latter purpose, but for the former the very letter may have to give way to the spirit. *State ex rel. Heiden v. Ryan,* 99 Wis. 123, 74 N. W. 544; *State ex rel. Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Commission,* 137 Wis. 80, 117 N. W. 846; *State ex rel. McGrael v. Phelps,* 144 Wis. 1, 128 N. W. 1041. The expounder is to "look to the whole and every part of the law, to

the intent apparent from the whole, to the subject matter, to the effects and consequences, to the reason and spirit, and thereby ascertain the ruling idea present" in the lawgiving body's mind at the time of the enactment, and then, so far as such idea can reasonably be spelled out of the enactment, give effect to it though it violates the letter. *Wis. Ind. School v. Clark Co.* 103 Wis. 651, 659, 79 N. W. 422.

True, the constitution is a very human document in the sense that it is a collection of words recognizing, characterizing, and guaranteeing the natural rights of man,—all that are essential to public welfare in the social state, but it is not so in the sense of creating such rights. The right to life, to liberty, to happiness, to equality one with another, are not of human creation. They are of Divine origin, though by human instrumentality some one or more of them might be taken away. It is to prevent that, in the main, the constitution was framed. So anything not expressly prohibited which reasonably conserves those God-given rights, is within its saving grace. Anything which clearly or materially impairs or destroys any one of them, is condemned by it. It were better to inculcate the idea that it is not subject to change with the change of times and conditions, though such new conditions, by logical process, may well be the deciding factor as to whether legislative means resorted to for a particular end are within or without the unchangeable constitutional principles. Manifestly it must have been the latter conception of the constitution which so inspired statesmen of the first century of the republic with veneration for it. That might well have inspired Webster to love it, "to have a profound passion for it," to "cherish it day and night," to "live on its healthful saving influence," and to "trust never, *never* to cease to heed it until" he should "go to the grave of his fathers," to "earnestly desire not to outlive it." It is good to draw inspiration from those lofty sentiments. I would not by word or deed, to any extent, give rise to the thought

that the ancient dignity of our system, in judicial conception here, has changed.

At no period has appreciation of the great work of the Fathers been more important than now. We need to sit anew, in thought, at their feet,—revive knowledge that the result was wrought by a body of men,—representatives of the great seats of learning of the English-speaking race of two hemispheres and otherwise men of broad experience, many of whom had been students of all federal governments of all prior ages in preparation for the special task,—as the historian declared, "the goodliest fellowship of lawgivers whereof this world has record,"—a body dominated by specialists, inspired "by ennobling love for their fellow men," and the thought that they wrought, not for their age alone, but for the ages to come, and, so, sought to avoid the infirmities of previous systems of government by the people, by carefully providing that no change in letter or spirit should occur except in a particular and most deliberate and conservative way.

Appreciating that the report of this case will be widely read and commented upon within and without the field of judicial administration, I particularly desire to aid in creating and promoting correct impressions respecting the dignity of the abolished defenses and the responsibility of courts for their existence.

True, such defenses are of judicial origin, but not as that term, without explanation, might be understood by laymen. They are so in the same sense that a large part of the law upon which rights and remedies depend, is of such creation. Nevertheless, all such is as much the law of this state, to be respected by the courts, as any part of the constitution or any act of the legislature. It did not originate with the courts of our age or century. It has not been within the competency of this court at any time to change it. The defenses in question became a part of the law of the mother country through its judicial administration long before the Revolu-

tion.  The law of such country, so far as adaptable to our
conditions here, was adopted when our independent govern-
ment was formed and became the common law of this coun-
try.  It was in full force in the territory of Wisconsin when
our state was admitted into the Union.  All officers were
sworn to maintain it,—that part relating to the law of negli-
gence as well as the rest,—and were bound to do so with as
much fidelity as if incorporated into the written law.  When
the constitution was adopted the unwritten law was substan-
tially given the cast of written law and as such firmly en-
trenched as fundamental, subject to legislative change, by
sec. 13, art. XIV, of the constitution in these words: "Such
parts of the common law as are now in force in the territory
of Wisconsin, not inconsistent with this constitution, shall be
and continue part of the law of this state until altered or sus-
pended by the legislature."

Every judge of every court has been sworn to maintain
the common law as thus entrenched in our system till changed
by the legislature.  So from the viewpoint of the present,
the law of negligence,—including the defenses in question,—
does not lose in dignity when compared with an act of the
legislature, because ages ago it had judicial origin.  It was,
as we have seen, with deliberation adopted by the people
when they organized our state government.  No court in our
time has had competency, we repeat, to change or create or
destroy in that field.  Power in that regard was expressly re-
served to the legislature.  It has been free to act in the mat-
ter, within such reasonable limits as not to violate guaranteed
rights, for over sixty years, while the courts have been pow-
erless to do more than to determine, to the best of their abil-
ity, the law as fundamentally adopted, or subsequently
changed, by the lawmaking power, and apply it.

Under the power reserved to the legislature as aforesaid, it
was competent for it to abolish the defenses in question and
to do it in such a way as to create inducement for employers

McHolm v. Philadelphia & Reading C. & I. Co. 147 Wis. 381.

to, voluntarily, become parties to the new system designed to better conserve human life and human happiness. Call the method "constitutional coercion," if thought best. That casts no discredit upon the method, for where coercion is necessary reasonable coercion is legitimate, no guaranteed rights being infringed upon.

It is needless to add that I heartily indorse all said in the court's opinion regarding the importance of the legislation which has received approval. May it be the beginning of a well rounded out constitutional system making every one who consumes any product of labor for hire pay his proportionate amount of the cost of the creation representing the personal injury misfortunes of those whose hands have enabled him to secure the objects of human desire, thus minimizing the sufferings which are the natural incidents of industry and should be borne, so far as they represent pecuniary sacrifice, by the mass of mankind whose desires are administered to by such industry.