STATE OF NORTH DAKOTA EX REL. HENRY AMERLAND,
Relator, Petitioner, v. JOHN N. HAGAN, Commissioner of
Agriculture and Labor and Ex-Officio Member of the Workmen's
Compensation Bureau of the State of North Dakota; L. J. Wehe
and S. S. McDonald, Commissioners and Members of the Work-
men's Compensation Bureau of the State of North Dakota; and
Obert Olson, State Treasurer of the State of North Dakota, and
as Such Member of the Workmen's Compensation Bureau of the
State of North Dakota and as Such State Treasurer, Respondents.

(175 N. W. 372.)

**Attorney general — states — appearance and defense — by state bureaus and
departments; rights of attorney general.**

1. In an original proceeding, where the attorney general has made a motion
to strike the return and answer of the workmen's compensation bureau, made
and filed by one of the members thereof, upon the ground that such attorney
general is the sole legal adviser and person entitled to appear by law for
such bureau, and that, further, such answer and return was filed without his
knowledge or consent, it is *held* that any board or department of the state
government have the right to personally appear in their own defense before
this court, and that the attorney general, although he is by statute the legal
adviser of the departments of the state government and entitled to represent
them in actions, sustains, nevertheless, in such actions a relation similar to
that of attorney and client, and he may not overrule or entirely disregard
rights of defense or of personal appearance that such departments may desire
to assert.

**Master and servant — Workmen's Compensation Act — constitutionality of
classification of hazardous employment.**

2. In 1919 the legislative assembly of North Dakota enacted a compulsory
Workmen's Compensation Act to cover employees engaged in hazardous
employment, wherein hazardous employment is defined to be an employment
in any business, trade, or occupation wherein one or more persons are em-
ployed, not casually, excepting agricultural, domestic, and railroad em-
ployees. Upon the issue raised by the relator engaged in the real estate and
loan business, that this definition by legislature first covers his employment,
which is nonhazardous and free from danger, it is *held* that it is within the
province of legislative power, in the exercise of the police power pursuant to

NOTE.—Authorities discussing the question of constitutionality of workmen's com-
pensation and industrial insurance statutes are collated in notes in 34 L.R.A. (N.S.)
162; 37 L.R.A. (N.S.) 466; L.R.A.1916A, 409; and L.R.A.1917D, 51.

public demand and as a matter of public policy, to classify generally a given employment as possessing elements of risk or hazard, and that such legislative expression will not be deemed arbitrary and unreasonable by the court unless a specific showing be made as a matter of fact that the employment of such relator is nonhazardous and without risk.

**Master and servant — Workmen's Compensation Act — constitutionality of classification of hazardous and dangerous employment.**

3. It is within the province of the legislature, in the proper exercise of its police power as a matter of public policy, to declare that there is an element of hazard or of danger in employment in the modern business world, and this court, upon construction of its definition in that regard, will not presume that the term "hazardous" must necessarily refer to employments that have heretofore been termed hazardous by reason of extra features of hazard inherent to the nature of occupation.

**Master and Servant — Workmen's Compensation Act — constitutionality.**

4. The legislature, within the exercise of its police powers in enacting a compulsory compensation act, may abrogate common-law defenses and impose liability without fault, substituting new rules of legal procedure in place of the old, so long as its action in that regard is not arbitrary, unjust, or unreasonable.

**Constitutional law — due process of law — privileges and immunities — obligation of contract — workmen's compensation.**

5. In the Workmen's Compensation Act of 1919, it is provided that employers subject to the act shall pay to the compensation fund, in proportion to the annual pay-roll expenditures, a rate prescribed by the bureau, pursuant to a classification of employments with respect to the degree of hazards, and that if an employer does not comply with such act he shall be deprived of common-law defenses concerning injuries sustained by his employees; and, further, that, upon compliance, the employer shall not be liable for injuries sustained by his employees, but that recourse must be had to the workmen's compensation fund. It is further provided that in such act no contract made by the employer with his employee which serves to deduct or retain any moneys that are paid to comply with this Compensation Act shall be valid. It is *held* that these provisions in the act are not deemed so arbitrary and unreasonable as a matter of law as to be violative of relator's constitutional rights, either under the due-process clause, the equal privileges and immunities clause, or the clause concerning the impairment of the obligation of contracts of either the Federal or state Constitution.

**Statutes — subject and title — constitutional provisions.**

6. It is further *held* that the Workmen's Compensation Act, which in the

title thereof states that the enactment is for the benefit of the employees engaged in hazardous employment, is not subject to the constitutional objection that it embraces more than one subject.

**Constitutional law — delegation of judicial power to workmen's compensation bureau.**

7. It is further *held* that the Compensation Act, which grants to the bureau power to classify employment and prescribe rates, is not unconstitutional upon the ground of an improper delegation of judicial power.

Opinion filed October 25, 1919.

Original application to enjoin and prohibit the workmen's compensation bureau from, in any manner, enforcing the Workmen's Compensation Act as against the relator, upon grounds of its unconstitutionality.

Petition dismissed.

*Lawrence & Murphy,* for relator.

Unless based upon the police power, such legislation would not have, and could not, have been sustained. Orient Ins. Co. v. Dages, 172 U. S. 557, 43 L. ed. 552, 19 Sup. Ct. Rep. 281; Magoun v. Illinois T. & S. Bank, 170 U. S. 283, 42 L. ed. 1037, 18 Sup. Ct. Rep. 594; Cunningham v. Northwestern Improv. Co. (Mont.) 119 Pac. 562.

The right to exercise police authority as such over the operator arises, in part at least, from the fact that he is engaged in an extrahazardous business. St. Louis Con. Coal Co. v. Illinois, 185 U. S. 203, 46 L. ed. 872, 22 Sup. Ct. Rep. 616; Cunningham v. Northwestern Improv. Co. (Mont.) 119 Pac. 562.

It does not follow because an act of the legislature is ostensibly passed as an exercise of the police power that it must be held as a valid exercise of that power. Marbury v. Madison, 1 Cranch, 137, 2 L. ed. 60; Mygler v. Kansas, 123 U. S. 661, 31 L. ed. 210; Freund, Police Power, § 20, p. 15; 12 C. J. p. 929.

No law prohibiting that which is harmless in itself, or commanding that to be done which does not tend to promote the health, safety, or welfare of society, will be sustained. People v. Weiner, 271 Ill. 74, 78, L.R.A.1916C, 775, 110 N. E. 870.

"The legislature cannot invade the privacy of a citizen's life, and

regulate his conduct in matters in which he alone is concerned, nor prohibit him any liberty the exercise of which will not directly injure society." Com. v. Turner (Ky.) 118 ·S. W. 1199; Com. v. Campbell, 133 Ky. 50, L.R.A.(N.S.) 172, 117 S. W. 383, 19 Ann. Cas. 159.

The essential quality of the police power as a governmental agency is that it imposes on persons and property burdens designed to promote the safety and welfare of the public at large. Chicago, etc. R. Co. v. State, 47 Neb. 549, 41 L.R.A. 481, 53 Am. St. Rep. 557, 66 N. W. 624; Com. v. Beatty, 15 Pa. Super. 5; Freund, Police Power, § 21, p. 16; Taylor, Due Process of Law, 255, 256.

*William Langer,* Attorney General, *Edw. B. Cox,* Assistant Attorney General, and *L. J. Wehe,* for respondents.

The police power extends to all the great public needs. Camfield v. United States, 167 U. S. 518.

The welfare of the state, while dependent to a great extent upon the success of its employments and industries, is even more dependent upon the welfare of its wage earners. And, further, that the minor dependents of the wage earner of to-day are the wage earners of to-morrow. State v. Clausen, 117 Pac. 1101; State ex rel. Yaple v. Creamer, 85 Ohio St. 349; State v. Mountain Timber Co. 135 Pac. 645, L.R.A.1917D, 10; Special Pamphlet on Workmen's Compensation Acts, C. J. § 5, p. 7.

"Any provision in a statute which declares its meaning or purpose is authoritative."

It is binding on the courts though otherwise they would have understood the language to mean something different. Sutherland, Stat. Constr. § 402, and cases cited.

The Workmen's Compensation Act is reasonable, and the classification is fair and works no unjust hardships. New York C. R. Co. v. White, 243 U. S. 188, 61 L. ed. 677. Opinion of Justices, 209 Mass. 607, 96 N. W. 308; Young v. Duncan, 218 Mass. 346, 106 N. W. 1; Hunter v. Colfax Consol. Coal Co. 175 Iowa, 245, 154 N. W. 1037; Sayles v. Foley, 38 R. I. 484, 96 Atl. 340; Mathison v. Mpls. Street R. Co. 126 Minn. 286, 148 N. W. 71; State ex rel. Yaple v. Creamer, supra; Shade v. Ash Grove Lime & P. Cement Co. 93 Kan. 257, 144 Pac. 249.

Comprehensive legislation under the police power of the state such as the act in controversy is sustainable against constitutional objections under analogous decisions. Boyd Workmen's Compensation, § 77; Holst v. Rowe, 39 Ohio St. 340; Mitchell v. Williams, 27 Ind. 62; McGlone v. Wornock, 111 S. W. 688; Blair v. Forehand, 100 Mass. 136.

Statutes imposing a liability on fire insurance agents, based upon benefit of a fund to be used for the care and support of injured firemen, have been upheld under the police power of the state in the states of New York, Illinois, and Wisconsin. Fire Dept. v. Noble, 3 E. D. Smith (N. Y.) 440; Fire Dept. v. Wright, 3 E. D. Smith (N. Y.) 453; Exempt Firemen's Fund v. Roone, 29 Hun (N. Y.) 391, 394; Firemen's Benev. Asso. v. Lounsbury, 21 Ill. 511, 74 Am. Dec. 115; Fire Dept. v. Helfenstein, 16 Wis. 136; State ex rel. Yaple v. Creamer, supra.

BRONSON, J. This is an original application to this court to restrain and prohibit the workmen's compensation bureau from applying, or in any manner enforcing, the Workmen's Compensation Act in this state.

The relator is a private citizen, alleging himself to be a citizen and taxpayer of Cass county, North Dakota. He is engaged in the real estate and loan business at Fargo, and employs two clerks, whose sole work, as he alleges, consists in keeping books, making records, writing letters and similar work, without any danger from any hazardous or dangerous work of any kind or nature whatsoever. He invokes the original jurisdiction of this court, claiming that the act by its term applies to him in his business; that the bureau are about to enforce the powers of this act as to him and deprive him of his constitutional rights; that multitudes of other citizens are likewise effected, and that the matter is of such public interest that it involves the franchises and prerogatives of the state and the liberties of its people. For the compensation bureau, the attorney general of the state has appeared and filed a motion to dismiss upon the grounds that the petition fails to allege facts sufficient to constitute a cause of action. The bureau itself, through one of its members, an attorney, has filed a return in the nature of a demurrer, which challenges the

jurisdiction of this court, the right of the relators to sue, and the sufficiency of the cause of action alleged. Furthermore, it has submitted, as its return, an answer, in the event of the demurrer being overruled, which alleges the legality and constitutionality of the Workmen's Compensation Act, under which such bureau is operating pursuant to the legislative enactment in 1919.

The attorney general has also filed a motion to strike from the records and files the answer of such bureau, upon the ground that the attorney general as such is the sole legal counsel of such bureau, and the only person entitled to appear in its behalf, and that such answer was filed without the consent, knowledge, or concurrence of such attorney general.

It is indeed unseemly that contentious strife should be made before this court between parties appearing for the respondents. These matters of contention will be noticed only to the extent of stating that the time has not yet arrived in this state when any board or officer of the state does not possess the same right as any individual to defend itself or himself by itself or himself in the courts of this state. Furthermore, although it is perfectly obvious under the statute that the attorney general is the general and the legal adviser of the various departments and officers of the state government, and entitled to appear and represent them in court, that this does not mean that the attorney general, standing in the position of an attorney to a client, who happens to be an officer of the government, steps into the shoes of such client in wholly directing the defense and the legal steps to be taken in opposition or contrary to the wishes and demands of his client or the officer or department concerned.

It appears from the return filed by the bureau that the relator is the president of the Amerland Company, a corporation which is engaged in real estate, loan, and insurance business in Fargo. That this corporation, through this relator as president, has made application, has paid the rate, and has filed under the terms of the Compensation Act, that it does employ two persons in the corporation offices. The return specifically alleges that the relator as an individual has made no application to comply with the Compensation Act, and that the bureau has made no attempt, either by communication or other-

wise, to compel compliance. This is not denied by the relator. There are therefore serious questions raised concerning the jurisdiction of this court upon the record as well as upon the issues framed. However, upon the conclusions adopted by this court, which occasions, in any event, a dismissal of the petition herein, it is deemed proper to consider the merits of the issues raised concerning the constitutionality of the Workmen's Compensation Act in view of the public importance of this act. The parties have filed excellent briefs, particularly the brief of the relator is exhaustive and of great assistance to this court.

The relator makes no contention concerning the wisdom, benefits, or the necessity of workmen's compensation laws. The relator, however, seriously challenges, upon various constitutional grounds, both Federal and state, the legality of the act involved, principally, as follows:

1. That the act is violative of both the Federal and the state constitutional provisions concerning due process, in that such act by its terms applies to all callings whether the same be industrial employment or not, to all business whether it be termed hazardous or not.

2. That the act is violative of the Federal and state constitutional provisions with reference to acts impairing the obligations of contracts, or the freedom to make contracts, for the reason that the employer is prohibited from freely contracting with his employee concerning wages to be paid, without deducting or considering the deduction to be paid to the bureau under the terms of the Compensation Act.

3. That the act violates the provision of the state Constitution, which provides that no bill shall embrace more than one subject, which shall be contained in the title, for the reason that the act, in the title, covers only hazardous employment, whereas the act itself by its terms covers both hazardous and nonhazardous employment.

4. That the act is violative of both Federal and state constitutional provisions with reference to the equal privileges and immunities of citizens, in that it is discriminatory and compels one employer operating a nonhazardous, or even less hazardous, employment to contribute to a fund to compensate those that may be injured in a hazardous employment.

The act involved is known as House Bill No. 56, enacted by the legislative assembly in 1919, and approved in March, 1919, and effective as a law commencing July 1, 1919.

In the title the law is stated to be an act creating a workmen's compensation fund for the benefit of employees injured and dependents of employees killed in hazardous employment. The purpose of the act is specifically stated as follows:

Section 1. The state of North Dakota, exercising herein its police and sovereign powers, hereby declares that the prosperity of the state depends in a large measure upon the well-being of its wage workers, and, therefore, for workmen injured in hazardous employments, and their families and dependents, sure and certain relief is hereby provided regardless of questions of fault and to the exclusion of every other remedy, proceeding, or compensation, except as otherwise provided in this act; and to that end all civil actions and civil causes of action for such personal injuries, and all jurisdiction of the courts of the state over such causes, are hereby abolished except as in this act provided.

In § 2, employment is defined as including employment by the state and all political subdivisions thereof, and all public and quasi public corporations, and all private employments.

"Hazardous" employment means an employment in which one or more employees are regularly employed in the same business, or in or about the same establishment, except agriculture and domestic service and any common carrier by steam railroad.

"Employment" means every person engaged in a hazardous employment under any appointment of contract of hire, or apprenticeship express or implied, oral or written, including aliens, and also including minors, whether lawfully or unlawfully employed, but excluding any person whose employment is both casual, and not in the course of the trade, business, profession, or occupation of his employer.

Sections 6 and 7 provide that every employer shall contribute to such compensation fund in proportion to the annual pay-roll expenditure to persons subject to the act, in accordance with the rates prescribed by the bureau concerning employments classified with respect to their degree of hazard.

Section 6 further provides that an employer who contributes to the fund is thereby relieved from all liability for personal injuries or death sustained by his employees, and the persons entitled to compensation under the act, and that recourse only shall be had to such compensation fund for such injuries.

Under the terms of § 11 employers who fail to comply with the terms of the act are not entitled to the benefits of the act during the period of such noncompliance, and are liable to their employees for damages sustained in the course of employment, free from common-law defenses of the fellow-servant rule, assumption of risk, or the defense of contributory negligence.

The act by specific exemption (§ 2) excludes application to agriculture and domestic servants and any common carrier by steam railroad. Under § 12, any employer engaged in an employment not classed as hazardous may comply with the act by paying the premium, and avail of the privileges thereof. Under § 21 no agreement by an employee to waive his rights to compensation under the act, nor any agreement to pay any portion of the premium to be paid by his employer, shall be valid, with the further provision that an employee who deducts any portion of his premium from the wages of his employee is guilty of a misdemeanor.

The above-stated provisions comprise the legislative acts principally concerned in the consideration of the constitutional questions raised by the relator.

The act in question is a compulsory insurance act. No contention is made that it is not within the police powers of the state to provide for a compulsory compensation act. It is contended, however, that it is not within the police powers of the state to compel employment, with little or no hazard involved, to be subject to a compulsory workmen's compensation act, and that it is not within the province of such police power to make, by legislative definition, an employment hazardous, which, in fact, is nonhazardous. It is contended that the title of the act involved, as well as the purpose of it as stated, is for the protection of workmen injured in hazardous employment; whereas, the act itself is made applicable to every employment by the definition of a hazardous employment. It is further contended that this definition is

merely an indirect attempt by legislative fiat to make every employment a hazardous employment, and to make the act in question applicable by such circumlocution to every employment so designated by legislative will as a hazardous employment. The first question presented, therefore, is whether the legislative act, in terms at least, is applicable to every employment within the state. It is clear from the terms of the act that the term "employer" includes a person engaged in a hazardous employment; that the term "employee" includes a person engaged in a hazardous employment under a contract of hire in the trade, business, profession, or occupation of his employer; that a "hazardous employment" is an employment of such employee by such employer in the business of such employer. In terms, therefore, the act covers the employment and the business of the relator as a hazardous employment.

Under the act in question the employment of the relator is termed hazardous. The relator alleges that his employment is nonhazardous; this is denied by the respondents. The relator makes no record to prove that in fact, the employment in question is nonhazardous. This court accordingly will not accept as conclusive or even as a presumption, that the mere alleged declaration of the relator that his employment is nonhazardous overrides the legislative declaration or proves thereby the arbitrary character of said legislative declarations. It is fairly well settled that the court will only hear objections to the constitutionality of laws from those who are themselves effected by its alleged unconstitutionality in the feature complained of. Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 576, 59 L. ed. 364, 368, 35 Sup. Ct. Rep. 167, 7 N. C. C. A. 570. It is contended, however, that the act, so extended by legislative definition as to include the employment of the relator, is arbitrary, unjust, unreasonable, and not to be included within the proper exercise of the police powers of the state. Again we recur to the oft-discussed and defined term," the police powers of the state." It is admitted that the subject of compensation insurance is within the police powers of the state. The question is the extent and reasonableness of the application.

Freund in his work on the Police Power, § 143, states some of the questions involved in legislation of this character to protect persons

engaged in industry, such as, whether a danger exists and of sufficient magnitude; whether it concerns the public, and whether the proposed measure tends to remove it; whether it is possible to secure the object sought without impairing essential rights and principles.

Fundamentally the test is one of reasonableness, whether the act conserves or is destructive of inherent rights and constitutional guaranties. 12 C. J. 934.

It is indeed interesting to observe, in legislation, the application, and in judicial interpretation, the recognition in increasing degree, of the police powers of the state, to alleviate the conditions and results that flow from the modern employment in the business world.

With seeming reluctance and hesitation, yielding step by step to the demands and necessities of the modern environment, has the legislative expression, as well as the judicial interpretation, abandoned or deemed it proper to recognize innovations upon the settled common-law principles applicable in the relation of employer and employee when the latter was injured.

Within recent years, in fact, within the last decade, the police powers of the state, as well as Federal legislation, has been applied to the problem of adequately enacting legislative rules and regulations for the protection of workmen. Now in a large number of states compensation acts of various kinds have been enacted, proceeding in the beginning, more upon the elective or even private insurance plan to the later and now increasing compulsory state insurance plans. It is no longer questioned that the state, in the exercise of its police power, has ample authority to establish by legislation departures from the old common-law principles affecting the employer's liability, and to substitute rules and regulations for the compensation of personal injuries that may be sustained by employees in the business of his master. The demand of the public has been insistent and increasing for the exercise of this police power as a matter of public policy and justice in the business world for both the employer and the employee. For several years commissioners on uniform state laws have been proposing and are proposing a uniform workmen's compensation act, compulsory in its features for all public industrial employment; also a

uniform act for compensation for occupational diseases incurred while in employment.

This police power was first seen in legislation and judicial interpretation concerning safety provisions and safety appliances acts for employees. Thence, in legislation and judicial interpretation, upholding abrogation of the common-law defenses for the employer, such as the fellow-servant rule and the comparative-negligence doctrine as applied to railroad employees engaged in extrahazardous callings. Thence, came along, with halting step almost, the early compensation acts, elective in principle, some supported by private casualty insurance, made persuasive for the employer by abrogating certain common-law defenses if he did not elect to comply. Now there is at hand state compulsory insurance acts. If the act involved differs from those of other states, such as, for instance, the Washington Act, it is a difference in the extent of its application to employments, not in principle.

It is needless to review or restate the reasons for the exercise of this police power. The adjudicated cases have stated them over and over again. It is interesting to note, however, the progressive judicial interpretation of the exercise of this police power, as a reasonable modern necessity, in a scant ten years, as disclosed in the celebrated Ives Case in New York, 201 N. Y. 271, 34 L.R.A.(N.S.) 162, 94 N. E. 431, Ann. Cas. 1912B, 156, 1 N. C. C. A. 517, and as now stated in the last pronouncement of our United States Supreme Court in Arizona Employers' Liability Cases (Arizona Copper Co. v. Hammer) decided on June 9, 1919 [250 U. S. 400, 63 L. ed. 1058, 6 A.L.R. 1537, 39 Sup. Ct. Rep. 553].

No longer is it regarded without the police powers of the state to provide for compulsory insurance to protect workmen and their families from the hazard of modern industry. No longer is it considered that mere novelty in legislation is a constitutional objection.

As stated in Arizona Copper Co. v. Hammer, supra: "Novelty is not a constitutional objection, since, under constitutional forms of government, each state may have a legislative body endowed with authority to change the law. In what respects it shall be changed, and to what extent, is in the main confided to the several states; and it is to

be presumed that their legislatures, being chosen by the people, understand and correctly appreciate their needs."

The question occurs, What is the legislative policy as expressed in North Dakota? What is the public policy as disclosed by legislative enactment and the action of the people in regard thereto? Is there a demand and an expressed need, as a matter of public policy, for such exercise of the police power of the state? It is clear beyond peradventure that the legislative will of North Dakota has declared that the prosperity of the state depends upon the well-being of his wage workers, and of their securing, when injured in hazardous employment, sure and certain relief, regardless of the question of fault, and that the state should exercise its police and sovereign powers in that regard. This act was adopted by an overwhelming vote of both branches of the legislative assembly. The same legislative assembly adopted other acts which created new legislation establishing and providing for the establishment of a state bank, a state mill, state terminal elevator, and more legislation of a novel character; some of this legislation was referred to the people by referendum petitions. This legislation so referred, though novel in its character and entering perhaps somewhat upon experimental fields, was ratified and approved by the people as a whole. This Compensation Act enacted similarly at a time when these other acts were enacted, and also covering a wider field than heretofore under many compensation acts in other states, nevertheless was not questioned by the people of this state by any requirement that it be referred to and considered by the electors of this state at the poles. It may well be said, therefore, that the legislative policy, in the exercise of the police powers as stated in the act, meet with not only the approval quite unanimously by the legislators, but also with the approval of the majority of the people of this state.

But, again, it is argued that a proper exercise of the police powers does not warrant a legislative declaration that an employment is hazardous which in fact is nonhazardous.

The question of whether compensation insurance may properly cover nonhazardous employment, if they may be so termed, is not before this court. The act involved concerns hazardous employments; the act by definition defines the classes that fall within the term "hazardous

employments." The employment of the relator falls within the definition given. Strenuously the relator contends that his business is nonhazardous and his employees are without risk. In a manner, the relator assumes that the term "hazard" or "hazardous employments" must be referred to its application as formerly used in some compensation acts, where the hazard of the employee protected was extra, greater, or more exceptional than that which applies to an ordinary business or occupation. In ordinary acceptation or comprehension, a "hazard," whether applied to contract relation, personal relation, or to golf or gambling, means and covers a risk or peril assumed or involved. Simply because other compensation acts, pursuant to the demands of public policy in other states, have extended only to certain classified and stated employments, extrahazardous in their nature, furnishes no ground for the contention that "hazardous" means "extrahazardous," where the legislative intent is plainly to the contrary.

Can it plainly be held as a matter of law that the employees of the relator are under no hazard while employed? It is evident that, if one of such employees should be injured in the course of his employment, the relator, in an action brought against him for damages sustained, might or would have recourse to the common-law defense, that such employee assumed the risk incident to the business in which he was engaged.

As Justice Winslow has pointed out in Borgnis v. Falk Co. 147 Wis. 327, 37 L.R.A.(N.S.) 489, 133 N. W. 209, 3 N. C. C. A. 649, there is now a vast difference between the simple risks involved in the relation of employer and employee in the business world when the common-law principles concerning the law of negligence came into recognition and the present day, intricate conditions of the modern world involving risks of every kind and character on every side of the employee while employed. In that case it is stated: "There are hazards in all occupations; indeed, they follow every man from the cradle to the grave. What constitutional requirement, either express or implied, clothes these court-made defenses with exceptional sanctity as to the less hazardous industries, and warns off from them the sacrilegious hand of the legislature? We are referred to none, and we know none."

Common observation, as well as ordinary reasoning, readily discloses that even the clerk or stenographer in the modern office engaged in the course of his occupation incurs risks vastly different than those applicable to similar situations in the comparatively similar business conditions that existed when the common-law principles concerning the law of negligence arose and were made applicable. Modern business conditions require a concentrated mind on the part of the employee on his work. His mind, instead of being required to be alert against dangers from without, is specifically required to be alert on the job.

His employment subjects him to possible risks on every side. It is possible to conceive that the employees of the relator are subject to risk not only from dangers within the modern office building while at work, from apparatus and instrumentalities used by the employee, but also from injuries that may occur proceeding from without, such as through faulty construction of the building, such as an injury that occurred in Chicago through a ship of the air crashing through the roof. His employee may be injured while on duty, wending his way through the crowds on the street or while ascending to his work on the elevator. It is no answer to state that this might likewise occur to one who is not so engaged or employed. It may likewise occur to one who is not engaged in an extrahazardous employment. It therefore is not within the province of this court to state as a matter of law that the employment of the relator is nonhazardous which the legislature has declared to be hazardous. As a matter of law this court is not in the position to declare that it is not within the legislative province to classify the business of the relator as possessing elements of hazard. By so doing the right is not necessarily taken away on the part of the relator to prove that in fact his specific business is not hazardous. There is no issue of fact before this court concerning this question. It appears, therefore, that the police powers of this state has been extended in the compensation act for the purpose of covering and protecting employees from injuries sustained in a hazardous employment, and that as a matter of public policy there is a well-recognized demand and need for legislation in this state through the exercise of such police powers, to cover employment as defined by the legislative will which are presumptively hazardous as a matter of law. The pertinent question

now presented to this court is whether such police power so exercised, as it effects the relator, runs contrary to the constitutional safeguards and inherent rights of the relator contained either in the Federal or state Constitution.

It is the undoubted duty of this court to uphold the constitutional rights of the relator, and to nullify the exercise of such police power if it has been so exercised unreasonably and arbitrarily as to interfere with relator's constitutional rights.

It is entirely unnecessary to review at length the adjudicated cases concerning the extent of the exercise of this police power with reference to such constitutional guaranties.

In the last expression of our United States Supreme Court in Arizona Copper Co. v. Hammer, 250 U. S. 400, 63 L. ed. 1058, 6 A.L.R. 1537, 39 Sup. Ct. Rep. 553, Justice Pitney has summarized, upon a review of the decisions, the principles of law that apply, by the following statement: "These decisions have established the propositions that the rules of law concerning the employer's responsibility for personal injury or death of an employee, arising in the course of the employment, are not beyond alteration by legislation in the public interest; that no person has a vested right entitling him to have these any more than other rules of law remain unchanged for his benefit; and that if we exclude arbitrary and unreasonable changes, liability may be imposed upon the employer without fault, and the rules respecting his responsibility to one employee for the negligence of another, and respecting contributory negligence and assumption of risk, are subject to legislative change."

In this regard, in applying a rule of interpretation Judge Winslow in Borgnis v. Falk Co. 147 Wis. 327, 37 L.R.A.(N.S.) 489, 133 N. W. 209, 3 N. C. C. A. 649, has stated as follows: "When an eighteenth century constitution forms the charter of liberty of a twentieth century government, must its general provisions be construed and interpreted by an eighteenth century mind in the light of eighteenth century conditions and ideals? Clearly not. This were to command the race to halt in its progress, to stretch the state upon a veritable bed of Procrustes."

In the light of these principles and disclosed legislative and public
44 N D.—21.

policy, this court does not deem the act so arbitrary and unreasonable in its application to the employee of the relator as to be termed violative of relator's constitutional rights under the due-process clauses of either the Federal or the state Constitution. The fact that the act is compulsory as to the relator is no ground of objection. The relator has no vested rights in the common-law defenses. Hawkins v. Bleakly, 243 U. S. 213, 61 L. ed. 683, 37 Sup. Ct. Rep. 255, Ann. Cas. 1917D, 637, 13 N. C. C. A. 959. The fact that liability without fault is created is neither novel nor subject to constitutional objection. New York C. R. Co. v. White, 243 U. S. 204, 61 L. ed. 675, L.R.A. 1917D, 1, 37 Sup. Ct. Rep. 247, Ann. Cas. 1917D, 629, 13 N. C. C. A. 943; Hunter v. Colfax Consol. Coal Co. 175 Iowa, 245, L.R.A.1917D, 15, 154 N. W. 1065, 157 N. W. 145, Ann. Cas. 1917E, 803, 11 N. C. C. A. 886. The act in terms confers a benefit upon the relator, for it relieves him from any liability for injuries that may be sustained by his employees during the course of the employment, if he subjects himself to the act. For him the act sets aside one body of rules and establishes another system of rules in lieu thereof. Arizona Copper Co. v. Hammer, supra. As against the contention that the act imposes a liability upon the relator concerning an employment wherein there is neither danger nor hazard, and therefore subjects his property to a taking without due process of law as well as being discriminatory and denying the equal protection of the laws, this court is not prepared to say as a matter of law that the legislative policy stating the employment of the relators to have therein elements of danger and hazard is so unreasonable and arbitrary that it should be considered violative of relators constitutional rights, in an absence of a showing of fact that such employment is in fact neither dangerous nor hazardous. Relator makes no complaint that the classification made or the rate prescribed by the bureau is unjust and unreasonable by relation to other employments. Necessarily the legislative branch must be allowed a wide latitude in determining what employments shall be included and the rates for each. When the acts of that branch become unreasonable and arbitrary, it then only becomes the duty of the courts to declare them beyond legislative authority. Jeffrey Mfg. Co. v. Blagg, 235 U. S. 577, 59 L. ed. 364, 35 Sup. Ct. Rep. 167, 7 N. C. C. A. 570.

The act is not subject to the constitutional objection that it interferes with the freedom of contract. The new statutory liability imposed in no manner affects the right of the relator to make a lawful contract with his employees. It is wholly proper that the legislature, in the proper exercise of its police power, prohibit the relator from contracting against his statutory liability, the same as heretofore it has provided with contracts against one's negligence. New York C. R. Co. v. White, 243 U. S. 207, 61 L. ed. 676, L.R.A.1917D, 1, Ann. Cas. 1917D, 629, 13 N. C. C. A. 943; Mountain Timber Co. v. Washington, 243 U. S. 246, 61 L. ed. 700, 37 Sup. Ct. Rep. 260, Ann. Cas. 1917D, 642, 13 N. C. C. A. 927; Hunter v. Colfax Consol. Coal Co. 175 Iowa, 245, L.R.A.1917D, 15, 154 N. W. 1049, 157 N. W. 145, Ann. Cas. 1917E, 803, 11 N. C. C. A. 886.

Likewise, in view of the interpretation given to the act, the constitutional objection made concerning the title of the act is untenable.

The fact that the act excludes from its operation domestic and agricultural employees, as well as railroad employees, does not give rise to the constitutional objection of unreasonable and arbitrary discrimination as a matter of law. The fact that the entire field subject to regulation has not been covered is not fatal. What trades and occupations may be regulated is ordinarily a matter for the legislature, in the absence of a distinctive showing of an unreasonable and arbitrary discrimination or classification. Similar exclusions in other compensation acts have been upheld. Hunter v. Colfax Consol. Coal Co. 175 Iowa, 245, L.R.A.1917D, 15, 154 N. W. 1054, 157 N. W. 145, Ann. Cas. 1917E, 803, 11 N. C. C. A. 886; New York C. R. Co. v. White, 243 U. S. 208, 61 L. ed. 677, L.R.A.1917D, 1, 37 Sup. Ct. Rep. 247, Ann. Cas. 1917D, 629, 13 N. C. C. A. 943; Jeffrey Mfg. Co. v. Blagg, 235 U. S. 576, 59 L. ed. 368, 35 Sup. Ct. Rep. 167, 7 N. C. C. A. 570; Matheson v. Minneapolis Street R. Co. 126 Minn. 286, L.R.A.1916D, 412, 148 N. W. 71, 5 N. C. C. A. 871. See L.R.A. 1917D, 53, note.

Likewise the constitutional objection is untenable that the act improperly delegates judicial powers to the bureau to fix and prescribe rates. L.R.A.1917D, 55.

It therefore follows that the terms of the act are not vulnerable to

the constitutional objections as raised by the relator.    The petition of the relator is accordingly dismissed.

GRACE, J., concurs.

BIRDZELL, J.   In this matter I have the gravest doubt as to whether this court should exercise jurisdiction to determine the issues raised upon the plaintiff's complaint.    The plaintiff's counsel very frankly state that the petitioner and those similarly situated, and his and their counsel (although who the latter are does not appear), are not before this court merely with a lawsuit, and that they do not desire to merely argue a case, but that they are rather desirous of presenting certain important legal questions.    This frank statement by counsel, it seems to me, amounts almost to an admission that this suit was begun for the sole purpose of testing the constitutionality of a law, rather than for the purpose of vindicating or establishing a right of a client in a controversy wherein that right might be more or less jeopardized by a certain law.

There are certain elements in the case which strongly suggest that the suit is merely a friendly one, framed without the active participation of representatives of the state or the workman's compensation bureau, for the purpose of testing the constitutional validity of the Compensation Act as against certain specified objections.    Litigation of this character should not be encouraged, and, in my judgment, deserves the condemnation applied to such an attempt by Mr. Justice Brewer in Chicago & G. T. R. Co. v. Wellman, 143 U. S. 343–345, 36 L. ed. 179, 180, 12 Sup. Ct. Rep. 400, when he said: "It was never thought that by means of a friendly suit the party beaten in the legislature would transfer to the courts an inquiry as to the constitutionality of the legislative act."

An examination of plaintiff's brief discloses that the principal attack upon the law is based upon its alleged violation of the Federal Constitution.   A Federal question is thus presented upon which the decision of this court would not necessarily be final, and to refrain from taking such action as would enable the parties to test before the proper Federal tribunal the validity of the act under the Federal

Constitution would be to place an obstruction in the path of one who may in good faith desire to have a determination of his cause in the only court that can ultimately determine it according to law. For this reason I am unwilling to dispose of the case on the ground that the plaintiff does not properly invoke the provisions of the Federal Constitution. I am content to leave such questions for the solution of the tribunal that may or may not choose to make them decisive, and shall pass presently to the questions upon which our opinion is required.

The main question, then, is the Federal question. Does the act under consideration deprive the plaintiff of liberty or property without due process of law? Before passing to a discussion of this question it seems necessary to observe that the plaintiff's counsel do not complain of any rate that has been prescribed by the bureau as being excessive. The objection goes wholly to the question of the power to prescribe any rate that shall be applicable to the plaintiff as an employer. It is said not to be a question of dollars, but rather a question of right, and that the plaintiff has the same constitutional protection for $1 or the few dollars involved in the premium charge that he would have for a thousand. This, of course, is true, but it is to to be borne in mind that it characterizes the plaintiff's attack and limits it to the *power* of the state to prescribe any rate according to which he may be compelled as an employer to contribute to an insurance or compensation fund for employees, applicable to reimburse them for injuries which they may sustain in connection with their employment. It is contended, in short, that the plaintiff's business is not hazardous, and that he cannot be compelled to insure against the consequences of accidents to his employees. It is conceded that the plaintiff is within the definition of hazardous employment as prescribed in the law, but it is argued that legislative fiat cannot make an employment hazardous that is not in fact so. Whether or not the definition employed in the act be a mere concession to the basis upon which compensation acts have been judicially upheld, we need not inquire. This case properly turns upon the underlying principle upon which similar laws have been sustained, and not upon any terminology that

might be more or less accidental due to the phraseology of the laws under consideration in other cases.

Neither is the question presented that this act is unconstitutional, as involving arbitrary classification as between the plaintiff and other employers who are not brought within its terms; that is, employers of domestic labor, agricultural labor, and operatives of steam railways. No distinction in fact is attempted to be drawn between the law in question and other laws of similar character that have been upheld as against the contention that they involved arbitrary classification, discrimination, delegation of legislative or judicial power, or lack of uniformity. Our attention is directed primarily and almost exclusively to the question as to the right of the legislature to require employers such as the plaintiff to contribute to an insurance fund for the benefit of employees injured in the course of their employment.

In considering this question as primarily a Federal question, there is little need to go beyond the last expression of the Supreme Court of the United States. In the case of Arizona Employers' Liability Cases (Arizona Copper Co. v. Hammer) 250 U. S. 400, 63 L. ed. 1058, 6 A.L.R. 1537, 39 Sup. Ct. Rep. 553, that court sustained an employer's liability law of the state of Arizona which imposed liability upon the employer for death or injury caused by any accident arising in the occupation *regardless of fault on the part of the employer.* This statute clearly changed the rule of common-law liability, and gave the employer no reciprocal advantage, as his liability was unlimited. (The law under consideration here gives for the premium a reciprocal advantage to employers. It relieves them from further liability.) In answer to the suggestion that the Arizona act might be extended by construction to nonhazardous occupations, it was stated in the main opinion by Mr. Justice Pitney: First, that the occupations in which the actions arose were indisputably hazardous, and hence the defendants had no right to raise the question; and, second, that employers in nonhazardous occupations were in little danger from the act, as it imposed liability only for accidental injuries attributable to the inherent dangers of the occupation. It was not indicated to what extent the judiciary could properly go in determining what was or was not a hazardous occupation, but the implication from the sec-

ond answer is that any employment in which an accident occurs might be considered ipso facto hazardous to that extent and the employer be made liable without fault. Similarly, it might be suggested here that, inasmuch as the employer raises no question upon the *amount* of premium he is required to pay, the premium must be assumed to have been fairly apportioned to whatever risk there may be in the particular employment.

The dissenting members of the United States Supreme Court, without exception, regard the logic of the majority opinion as supporting the proposition that the element of hazard in the employment, as the term is commonly understood, is not essential to the validity of legislation which in one form or another fixes a liability upon the employer without his fault. In fact Mr. Justice McKenna not only proposes the query as to whether the logic of the majority will support an extension of the principle to nonhazardous employments, but he suggests that the very act in question in that case applies to all manufacturing without qualifying words which would distinguish between hazardous and nonhazardous manufacturing. And Mr. Justice McReynolds asserts in his opinion that the grounds suggested to support the Arizona statute "amount in substance to asserting that the legislature has power to protect society against the consequences of accidental injuries, and therefore it may impose the loss resulting therefrom upon those wholly without fault, who have afforded others welcomed opportunities to earn an honest living under unobjectionable conditions." It seems to me that these interpretations of the majority opinions are inescapable. If correct, the highest judicial authority has given its sanction to a construction of article 14 of the Federal Constitution that permits the states to establish at the expense of employers insurance funds to compensate for all occupational casualties resulting in injury or death to employees.

From the standpoint of the public welfare or the individual welfare of the employee or his dependents, it is indeed difficult to see why lines of demarkation should be drawn, except for purposes of practical administration, on the mere estimate of probable casualties, excluding employments showing slightly fewer casualties than a basic minimum. To my mind it seems wholly unimportant whether the

legislature or the bureau employs a definition that will be applicable to an employer in an industry in which it may safely be estimated from statistics that within a given time one in one hundred employees will be killed and three injured, or whether the definition be one applicable to an industry or employment in which the estimate be one and three, respectively, in a thousand or ten thousand. There would be ten and one hundred times the hazard, respectively, in the latter cases that there is in the first. From the standpoint of the public or of the dependents of the employee who happens to be the one in a thousand, there is no logical basis for distinction. Granted the constitutional power of the legislature to provide insurance at the expense of employers for the benefit of employees, is it for the courts to say with what occupations the legislature shall stop or what degree of hazard there must be in a particular employment to enable the legislature to authorize the inclusion of the employees? Of course it is assumed that an appreciable hazard must exist, and that reasonable and appropriate measures are provided to effect the desired end. But beyond this the matter would seem to be entirely for the legislature. And in providing measures, shall the legislature be confined to unbending definitions, or is there room for a policy that will admit of greater flexibility of application as experience demonstrates the need?

Counsels' argument that the legislative definition amounts to a legislative fiat declaring an employment to be hazardous that is not in fact so ignores the operative plan of the law. The plaintiff is not injured by a mere definition. A rate must first be promulgated applicable to him, and this can only be done after the classification of employments with respect to hazard is made by the bureau under § 7 of the act. Presumably this has been done. If the plaintiff's constitutional rights have been violated, therefore, they have been violated by the bureau, but yet we are not asked to review this action.

The bureau, acting under the section referred to, could clearly determine that there is no hazard in a particular employment and consequently no premium payable. They could determine, possibly with a fair degree of accuracy, based upon experience, the degree of hazard involved in employments that are commonly regarded as involving no particular element of danger. Methods of accounting and compilation

of statistical data are directed which should tend to greater accuracy in this respect. We cannot assume that the bureau has not been or will not be guided by such experiences as have a proper bearing on the question of rates. It follows from this that the property of the plaintiff is not taken without due process so long as the rate demanded is based upon a real hazard and properly prorated. If the plaintiff desires to raise an issue of fact as to the findings of the bureau in this respect, such proceedings should be had as would put the court in a position to ascertain the fact. It is clear, then, that the legislative definition of hazardous employment does not of itself obligate the plaintiff to contribute to the fund, and it must be assumed that the bureau has or will do its full duty. At any rate this court cannot take judicial notice that its findings are or will be erroneous.

Upon the question as to whether the subject of the act is expressed within the title within § 61 of the state Constitution, it seems to me that it is entirely clear that the subject is adequately expressed.

For the foregoing reasons I am of the opinion that the relief prayed for should be denied. In view of the fact that a majority of the court does not adopt any opinion as expressing the views of the court, I may properly add that I do not agree to the syllabus, except to the extent indicated in the foregoing opinion.

CHRISTIANSON, Ch. J. (concurring specially). The relator has applied to this court for a prerogative writ to enjoin the members of the workmen's compensation bureau from establishing the workman's compensation fund, and from assessing, levying, or collecting any premiums from the petitioner and others similarly situated. The application is made by the relator as a citizen and taxpayer of the state, and as an employer of office clerks and stenographers, after the refusal of the attorney general of the state to institute the proceeding, or permit it to be instituted in his name.

The Workmen's Compensation Act became effective March 5, 1919. By its terms $50,000 (or so much thereof as might be necessary) was appropriated from moneys in the general fund of the state to put the act into effect, with the proviso that the workmen's compensation bureau should reimburse the general fund of the state for all moneys

expended out of such appropriation from moneys collected under the provisions of the act. In due course the act was put into operation, the members of the workmen's compensation bureau were appointed, and they entered upon the discharge of their duties. Office and office equipment were procured; clerks, stenographers, and other assistants employed, and the expense incident thereto paid out of the moneys appropriated by the legislature for that purpose; premiums have been collected from a large number of employers, and claims filed by injured employees, and action taken thereon by the bureau. Sufficient moneys have been collected under the act so that the bureau is not required to expend any more of the moneys appropriated by the legislature, but, on the contrary, stands ready and willing to reimburse the general fund of the state for all moneys expended out of the appropriation. All this has occurred without any attempt on the part of the relator or anyone else to question the validity of the act. This is not a proceeding, therefore, to prevent the expenditure of state funds in putting an unconstitutional law into operation, nor is it a proceeding to prevent an unconstitutional act from being put into operation at all; but it is rather one to intercept and stay official action under an enactment which has been in full operation for some time.

The relator does not contend that the bureau has attempted to collect any premium from him, or in any other manner sought to compel him to comply with the law, or to apply any of its provisions to him. The respondents, on the other hand, expressly aver that no such attempt has been made. The relator, therefore, has hardly shown any such state of facts as would entitle him to maintain an injunctional action in his own behalf against the workmen's compensation bureau. For "courts, as a rule, will not interfere with the duties of any department of government unless under special circumstances and when necessary to the protection of rights of property." 14 R. C. L. p. 434. "The mere fact that a law is alleged to be unconstitutional does not confer jurisdiction on courts to interfere with the acts of executive officers while proceeding in pursuance of its requirements. The duty of the court is to determine actual controversies, when properly brought before it, and not to give opinions on mooted questions or abstract propositions. Before it can assume to determine the constitutionality of

a legislative act, the case before it must come within some recognized ground of equity jurisdiction, and present some actual or threatened infringement of the rights of property on account of such unconstitutional legislation, and where it is apparent that the remedy at law is adequate relief will be refused." 14 R. C. L. pp. 435, 436. See also 6 R. C. L. pp. 76, 77; 12 C. J. p. 783, § 214; Cooley, Const. Lim. 7th ed. pp. 213 et seq.

But, of course, the private rights of the relator are not material except as they may or may not appeal to the court in considering whether the relator should be given leave to institute and prosecute the proceeding. For it is well settled that the original jurisdiction conferred upon this court by § 87 of the Constitution was not conferred for the benefit of private suitors, or to vindicate merely private or local rights. It is a prerogative jurisdiction. It may be invoked only where the general interest of the state at large is involved in some way. "A case involving a mere private interest, or one whose primary purpose is to redress a private wrong, will not be entertained." State ex rel. Bolens v. Frear, 148 Wis. 456, 499, L.R.A.1915B, 569, 134 N. W. 673, 135 N. W. 164, Ann. Cas. 1913A, 1147. The original jurisdiction "is not only limited to prerogative writs, but it is confined to prerogative causes." Atty. Gen. v. Eau Claire, 37 Wis. 400, 443. The people in their Constitution conferred this great power upon this court, that it might be used in their behalf to protect the sovereignty of the state and the liberties of the people. This principle was announced in the early history of this court, and has been steadfastly adhered to. As was well said by this court, speaking through Chief Justice Morgan, in State ex rel. Steel v. Fabrick, 17 N. D. 532, 536, 117 N. W. 860: "These sections [of the Constitution] have been under consideration in many cases by this court. From these cases it is established without dissent that the jurisdiction is not to be exercised unless the interests of the state are directly affected. Merely private rights are not enough on which to base an application for the issuance of original writs by this court. The rights of the public must appear to be directly affected. The matters to be litigated must not only be publici juris, but the sovereignty of the state, or its franchises or prerogatives, or the liberties of its people, must be affected. Before the

court will, in the exercise of its original jurisdiction, issue prerogative writs, there must be presented matters of such strictly public concern as involve the sovereign rights of the state, or its franchises or privileges."

In the case at bar the chief law officer of the state refused to institute the proceedings. He appeared as attorney for the respondents. Under the circumstances I do not believe that a private relator should be granted leave to institute this proceeding. Anderson v. Gordon, 9 N. D. 480, 52 L.R.A. 134, 83 N. W. 993; State ex rel. Byrne v. Wilcox, 11 N. D. 336, 91 N. W. 955. For these reasons do I concur in a dismissal of relator's petition, but express no opinion upon the propositions discussed in the other opinions filed in this case.

ROBINSON, J. (dissenting in part). Within the past ten years many of the states have passed workingmen's compensation or wage earners' accidental insurance acts, which have been well sustained and approved by the courts. In this case it would be easy to write a book by quoting freely from the numerous statutes and decisions on workmen's compensation acts, or, more properly, wage earners' accidental insurance acts; but, so far as known to the writer, the decisions have little bearing on our act, because it is so different from the other acts.

The compensation or insurance act is to be liberally construed: Its purpose is beneficent and remedial and within the scope of proper state legislation. The purpose of such an act is to make a business that is hazardous and dangerous bear the inherent risks of personal injury arising in the course of the employment, regardless of ordinary negligence; also, to do away with long-continued and vexatious litigation and the exorbitant claims of personal-injury lawyers, who commonly take half the sum recovered, as if they had sustained half the injury. Then, as it were, they move heaven and earth to procure a verdict and to sustain it, and often stand in the way of a settlement of great benefit to the injured party.

The relators show they employ only two persons in the capacity of typewriters, and that the occupation is in no way dangerous or hazardous, and that the same is true of all the ordinary clerical occupations, and that on all such occupations the bureau has levied and demanded

a tax or premium for risks which do not exist, which is the taking of property in an arbitrary manner and without due process of law. The most material parts of the act in question and its title are as follows:

The title: An Act Creating the Workmen's Compensation Fund for the Benefit of Employees Injured and Dependents of Employees Killed in Hazardous Employment.

Sec. 2. Hazardous employment means any employment in which one or more employees are regularly employed in the same business or in or about the same establishment, except agricultural, domestic service, and common carriers by steam railroads.

Sec. 3. That from and after July, 1919, it shall be the duty of the workmen's compensation bureau to disburse compensation from the workmen's compensation fund to any employee subject to the act for injuries arising in the course of his employment.

Sec. 5. In the month of July of each year every employer carrying on a hazardous employment, as defined by this act, shall mail to the bureau a statement giving the number of his employees, the kind of employment, and the wages paid to each of them.

Sec. 6. Every employer subject to this act shall pay annually to the bureau the amount of premium determined and fixed by the bureau, the amount to be determined by the classification, rules, and rates *made and published* by the bureau.

Sec. 9. Employers who comply with this act are not liable to damages for any injury or death of their employees.

We should note well that no amount is payable until the rules and rates have been "made and published," and thus far no rates have been published. However, it is true the bureau has employed a party from Ohio to make the rates for $3,600, and to give advice concerning the same for $1,500 a year. He has made about 1,400 different rates, which the bureau has adopted and kept without publishing the same, though it has collected about $500,000.

In the state of Washington there are forty-two classes of rates fixed by statute and expressed by figures indicating a decimal part of the pay roll. 3 Rem. & Bal. Code, § 6604. The rates are classified and expressed thus:

Tunnels; bridges; ditches; sewers; house moving; house wreck-
ing .................................................. .065
Iron and steel frame structures ......................... .080
Shaft making ......................................... .060
Carpenter work ....................................... .035

In that way any hazardous industry is charged with a specific rate, which is not left to the conjecture of any expert or bureau.

In Washington each rate commences with a decimal .0, which means that the premium is less than 1 per cent of the pay roll, but in North Dakota the rates are much higher than in Washington, and not one of the 1,400 rates commences with a decimal .0. Here are a few specimens of the North Dakota rates on the pay roll.

Coal mining, lignite ................................... 4.95
Carpenter work—in shop .............................. 2.13
     ″        ″  —out of shop .......................... 4.35
Newspaper offices .................................... .40
Stores, wholesale and retail ........................... .60
Insurance agencies ................................... .65
Clerical and office employees .......................... .20
Hotels .............................................. .85
Restaurants .......................................... .70
Domestic service ..................................... .70

The principal objection to the act in question and the procedure under it are as follows:

(1) The title of the act relates only to hazardous business. Hence, so far as the act relates to a nonhazardous business, it is not within the title. In the body of the act the word "hazardous" is given a meaning unknown to the English language. It defines the words "hazardous employment" to mean any employment in which one or more persons are regularly employed in the same business or establishment, with the exception of agriculture, domestic service, and steam railroads; but as there can be no employment in which there is not one or more persons, the act does, in effect, declare that every employment is hazardous, with the exceptions stated, which declaration is absurd. Section 61 of the Constitution makes the title of paramount impor-

tance. Its function is to indicate to the public and the legislature the
subject of the legislation contained in the act. The words used in the
title cannot be varied or changed by reference to the body of the act.
Erickson v. Cass County, 14 N. D. 494, 92 N. W. 841. In the title
of an act the legislature must use English words in their ordinary and
accepted meaning. They may not use Greek or Latin and then ex-
plain the words in the body of the act.

(2) Now the Constitution provides all laws of a general nature
must have a uniform operation. § 11. The act in question is of a gen-
eral nature and its operation is not uniform. It excepts agriculture,
domestic service, and steam railroads. It was passed by a farmer
legislature, which did not care to impose on themselves the burdens of
compulsory insurance for their employees. It is an act for the cities,
and not for the country. The farmer legislature had no interest in
the rates, and hence the rate-making power was delegated to a bureau,
and it let out the job to a nonresident, who had no interest in the
rates only to make them in keeping with his compensation of $5,100.
Under the liberal power given by the statute the bureau might have
fixed the compensation at $30,000 or $40,000. However, this court has
held void a statute giving the secretary of state power to use all the
motor vehicle tax for its collection. State ex rel Fargo v. Wetz, 40
N. D. 299, 5 A.L.R. 731, 168 N. W. 845.

(3) Under the statute the ratemakers do act as lawmakers, and
levy a tax on a large class of persons without giving them a hearing,
and the rates made are, to a large extent, arbitrary. To impose ex-
cessive rates for insurance against real hazards or to impose any rates
or premiums when there is no hazard is to impose a burden without
a corresponding benefit; it is to take property without due process of
law. To hold otherwise would be to put the employers at the mercy
of the ratemakers, and to subject them to loss of property without due
process of law, for if a bureau can fix a rate at twice the amount of a
just premium, why not ten times the amount; where is the line of
limitation?

In this case special complaint is made of rates fixed on occupations
in which there is no inherent risk, the service of typewriters, ordinary
clerical help, domestic service, and service in hotels and restaurants;

and it appears that the rates for hotels and restaurants are nearly 1 per cent of the pay. roll, which is the powder-making rate in Washington. As the business involves no material risk, the rate serves no purpose only to give an excuse for reducing wages and charging exorbitant prices, such as, 10 cents for a cup of tea, coffee, or milk. It gives an excuse for profiteering. We must hold that when power is given to any board without special limitation, the law does always imply a condition that the power must be used in a just and reasonable manner. The legislature itself does not possess arbitrary power to levy a tax or to deprive any person of property, and of course it cannot delegate such power to any board or person.

As the chief reason for state insurance is that it may carry the risk for less than private companies, the state rate must be excessive when it is higher than that of solvent corporations. In this case it does not seem necessary to hold void the Workmen's Compensation Act, but in regard to proceedings under the act the court should hold and adjudge:

(1) That, without first making and publishing a schedule of rates, the bureau has no authority to demand, receive, or collect any money from any party.

(2) The schedule of rates must be just and reasonable, and not arbitrary, excessive, and vexatious.

(3) In ordinary clerical service, in domestic service, in ordinary hotel and restaurant service, there is no inherent and material risk, and hence there is no reason for any insurance or premium on the business.